IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| SAFETY VISION, LLC | § | |
| *Plaintiff,* | § | |
| | § | |
| v. | § | CIVIL ACTION NO. 4:21-cv-03306 |
| | § | |
| LEI TECHNOLOGY CANADA AND | § | |
| LANNER ELECTRONICS, INC. | § | |
| *Defendants.* | § | |

## DEFENDANT LEI TECHNOLOGY CANADA'S MOTION FOR SUMMARY JUDGMENT PURSUANT TO FEDERAL RULE OF CIVIL PROCEDURE 56

Defendant LEI Technology Canada ("LEI" or "Defendant"), by and through their undersigned counsel, files this Motion for Summary Judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure and would respectfully show the Court the following:

### I.      BACKGROUND

1.1     Plaintiff Safety Vision, LLC ("Safety Vision" or "Plaintiff") filed this action for breach of contract against LEI stemming from an ODM Agreement between LEI Technology Canada and Safety Vision entered into by Plaintiff and Defendant on or about January 12, 2016.[1]

1.2     LEI moves for summary judgment on the grounds

    a.  Safety Vision cannot establish (and has not alleged) a breach by LEI to support the breach of contact cause of action, and

    b.  If Safety Vision could establish a defect or nonconformity of the product, under the terms of the contract Safety Vision's the sole remedy is repair or replacement of a failed product, and

    c.  Safety Vision breached the agreement by failing to tender payment of $244,927.70 for products accepted.  LEI is entitled to judgment for $244,927.70 as a matter of law.

1.3     Based on the above grounds, there is no genuine issue of material fact and Defendant is

---

[1] Plaintiff also alleged breach of contract against Lanner Electronics, Inc., but has not achieved service on Lanner Electronics, Inc.

entitled to summary judgment as a matter of law.

## II.      RELIEF SOUGHT

2.1      Pursuant to Rule 56 of the Federal Rules of Civil Procedure, LEI seeks summary judgment on Safety Vision's breach of contract claim as alleged in Plaintiff's Original Petition, as no genuine issues of material fact exist.  LEI further seeks summary judgment on its Counter Suit against Safety Vision because LEI conclusively established Safety Vision breached the ODM Agreement by failing to pay $244,927.70 for products accepted under Purchase Orders to LEI.

## III.      FACTUAL SUMMARY

3.1      On January 12, 2016, Safety Vision and LEI entered into an ODM Agreement for the design, manufacture, and sale of embedded computer systems.  Exhibit A, ODM Agreement between LEI Technology Canada and Safety Vision.  The embedded computer system was used by Safety Vision in a mobile surveillance system, which Safety Vision sold and installed in approximately 1,200 mass transit customers.  Exhibit C, p. 4.  Under the Agreement, LEI designed, manufactured, and shipped a total of 1,270 units to Safety Vision.

3.2      Safety Vision claims the product was not made, engineered, designed and manufactured "in a good and workmanlike manner so that it would operate and function without material fault." Exhibit B, Plaintiff's Original Petition, ¶ 21.  Safety Vision further alleges LEI "failed and refused to comply with its obligations under the Agreement and continue to ignore and refuse to pay to Plaintiff the sums it has incurred for the defects and shortcomings in the product…"  Ex. B, ¶ 21.

3.3      Safety Vision accepted products provided by LEI but failed to remit payment of $244,927.70.

3.4      The pertinent provisions of the contract are sections 7.1, 10.5 and 11.

7.1.  Subject to acceptance of Products in conformity with the Purchase Order and the specifications as provided for in this Agreement, invoices shall be due 40 days after receipt from LEI or 1% net 10 days.  Payment for the Products shall be in US currency and shall be made by wire transfer to LEI's designated bank account.

10.5. **Inspection:** Company has the right to inspect delivered Product to ensure it conforms to the Purchase Order, specifications contained herein and to such other specifications as the parties agree to in writing (the "Inspection Standards"), provided, however, that Company must finish such inspection within 30 days ("Inspection limited time") after physical receipt of the shipment by Company. Any delivery will be deemed fully accepted by Company if does not notify to LEI of any nonconformity within 10 days from the last Inspection limited time. If any Product does not meet the Inspection Standards, Company shall notify LEI to that effect, and has the right to reject any non-conforming Product of the particular delivery and deduct the non-conforming Product from the order. LEI will be responsible for the return freight and associated costs for any non-conforming products.

## 11. WARRANTY

### 11.1. Hardware:

11.1.1.   LEI warrants the hardware portion of its Products to be free of defects in workmanship and materials and to conform to the specifications contained herein and to such other specifications as the parties agree to in writing, under normal use and service, for 12 months from the date of delivery to Company. Company may purchase at time of order extended warranty , at rates and durations negotiated and agreed to by both parties.

11.1.2.   If a Product does not operate as warranted during the applicable warranty period, LEI shall, at its option and expense, (1) repair the defective product or part, (2) deliver to customer an equivalent product or part to replace the defective item. All products that are replaced will become the property of LEI. Replacement products must be new. Any replaced or repaired product or part has a warranty with coverage as described in Section 11.1.1 for ninety (90) days from delivery to Company or for the remainder of the initial warranty period, whichever is longer.

11.1.3.   LEI shall not be responsible for any software, firmware, information, or memory data of customer contained in, store on, or integrated with any product returned to LEI pursuant to any warranty.

11.1.4.   Procedures: Warranty service may be obtained by contacting a LEI office within the applicable warranty period for a Return Material Authorization (RMA) number. Once an RMA number is issued, the defective product must be shipped back to LEI prepaid, insured and wrapped in the original and similar shipping package to ensure that it will not be damaged during shipment. When returning the defective product to LEI for service, the RMA number must be marked on the outside of the shipping package. Any product returned without an RMA number shall be rejected and sent back to the Company, and LEI reserves the right to have Company bear the cost of sending back such products. Transportation costs, if any, incurred in connection with the return of a repaired or replaced item to Company shall be borne by LEI; provided that, such costs shall be borne by Company if LEI reasonably tests and determines that the item is conforming. If LEI determines, in its reasonable discretion, that the allegedly defective item is not covered by the terms of the warranty provided thereunder or that a warranty claim is made after the warranty period, the cost of repair by LEI, including all shipping expenses, shall be reimbursed by Company within thirty (30) days upon receiving LEI's written notice.

### 11.2. Warranties exclusive:

11.2.1.   If the Product does not operate as warranted above, the customer's sole remedy shall be, at LEI's option, repair or replacement. The foregoing warranties and remedies are exclusive and are in lieu of all other warranties, expressed or implied, either in fact or by operation of law, statutory or otherwise, including warranties of merchantability and fitness for a particular purpose. LEI neither assumes nor authorizes any other person to assure for it any other liability in connection with the sale, installation maintenance or use of LEI's Product.

11.2.2.   The foregoing warranties and remedies are for Company's exclusive benefit. Any and all warranties shall be void as to Product components damaged or rendered unserviceable by: (1) the customer's or any third person's misuse, neglect, improper installation or testing; or (2) fire, water, accident, lightning or other peril; or (3) unauthorized attempts to repair.

## IV.    SUMMARY JUDGMENT STANDARD

4.1     Under Federal Rule of Civil Procedure 56, a party is entitled to summary judgment if the pleadings, affidavits and other summary judgment proof show "there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law." Fed R. Civ. P. 56(a); *Mississippi River Basin Alliance v. Westphal,* 230 F.3d 170, 174 (5th Cir. 2000).  An issue is "genuine" if the evidence is sufficient for a reasonable jury to return a verdict in favor of the nonmoving party.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Hamilton v. Segue Software, Inc.*, 232 F.3d 473, 477 (5th Cir. 2000).  A fact is "material" if its resolution might affect the outcome of the case.  *Anderson*, 477 U.S. at 248; *Wyatt v. Hunt Plywood Co., Inc.*, 297 F.3d 405, 409 (5th Cir. 2002).

4.2     The moving party bears the burden of demonstrating that there is no genuine dispute as to any material fact, but it need not negate the elements of the nonmoving party's case.  Fed. R. Civ. P. 56(a); *Willis v. Roche Biomedical Labs*, 61 F.3d 313, 315 (5th Cir. 1995) (citing *Celotex v. Catrett*, 477 U.S. 317, 322-23, 106 S.Ct. 2548, 2552-54 (1986); *Boudreau v. Swift Transp. Co., Inc.*, 402 F.3d 536, 540 (5th Cir. 2005).  If the burden of proof at trial lies with the nonmoving party, the moving party may satisfy its initial burden by "'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Celotex*, 477 U.S. at 325.

## V.    SUMMARY JUDGMENT EVIDENCE

5.1     Defendant attaches the following evidence in support of this Motion:

Exhibit A:     ODM Agreement between LEI Technology Canada and Safety Vision

Exhibit B:     Plaintiff's Original Petition

Exhibit C:     Report of Michael Hubbell

Exhibit D:     Declaration of Terence Chou, GM of LEI

Exhibit E:     Letter from Geoffrey Egger, LEI to Safety Vision dated June 7, 2021.

## VI.    ARGUMENTS AND AUTHORITIES

6.1    Safety Vision has only alleged a cause of action for breach of contract.  Ex. B.  LEI asserted a countersuit against Safety Vision for breach of contract to collect the $244,927.70 owed by Safety Vision to LEI under the ODM Agreement.  *See* Defendant LEI Technology Canada's Original Answer and Countersuit against Safety Vision.  To prevail on a breach of contract claim, a party must establish the following elements:

    a.  A valid contract existed between the plaintiff and defendant;

    b.  The plaintiff tendered performance or was excused from doing so;

    c.  The defendant breached the terms of the contract; and

    d.  The plaintiff sustained damages as a result of the defendant's breach.

*West v. Triple B. Servs., LLP*, 264 S.W.3d 440, 446 (Tex. App.—Houston [14th Dist.] 2008, no pet.). The issue of whether a party breached a contract is a question of law.  *Garza v. Southland Corp.* 836 S.W.2d 214, 219 (Tex. App.—Houston [14th Dist.] 1992, no writ).

**A.  Plaintiff has not alleged or established a breach by LEI to support the breach of contact cause of action**

6.2    The only breach alleged by Safety Vision is contained in paragraph 21 of the Original Petition:

> Defendants agreed to make, engineer, design, and manufacture the custom product/equipment in a good and workmanlike manner so that it would operate and function without material fault.  In this connection, Defendants have failed and refused to comply with its obligation under the Agreement and continue to ignore and refuse to pay the plaintiff the sums it has incurred for the defects and shortcomings in the product Defendants engineered, designed and manufactured and delivered to Plaintiff, thereby causing additional and ongoing damage to Plaintiff in an unspecified amount.  The actions of said Defendants as described hereinabove constitute breach of contract, which proximately caused damages to Plaintiff as described herein, for which Plaintiff hereby sues.

6.3    Safety Vision has designated one expert, Michael Hubbell.  Hubbell issued a report dated September 30, 2022.  Exhibit C.  In his report, Hubbell states, "LEI failed to fulfill its obligations under the terms and conditions of the January 2016 contract with [Safety Vision]."  However, Hubbell fails to identify any alleged breach of the ODM Agreement by LEI except to state, "[the]

January 2016 agreement between [Safety Vision] & LEI includes provisions that LEI will warrant '…the hardware portion of its Products to be free of defects in workmanship and materials and to conform to the specifications contained herein and to such other specifications as the parties agree to in writing, under normal use and service…'" Ex. C, p. 6.

6.4    Safety Vision has not identified any specific defect in the product sold by LEI or any nonconformity between the product and the specifications.  Instead, Safety Vision claims their customers reported problems with the functionality of the mobile video surveillance system.  Ex. C, p. 5.  The mobile video surveillance system sold by Safety Vision to mass transit customers included the product sold to Safety Vision by LEI, but the LEI product was only a portion of the system.  Ex. C, p. 4.  Texas law does not generally recognize a product failure standing alone as proof of a product defect.  *Ford Motor Co. v. Ridgway*, 135 S.W.3d 598, 600 (Tex. 2004).

6.5    Without proof (or an allegation) of a defect in the product sold by LEI or a nonconformity between the LEI product and the agreed specifications, Safety Vision cannot, as a matter of law, establish LEI breached the ODM Agreement.

**B.  Under the terms of the contract, the sole remedy for alleged defects in workmanship or nonconformity is repair or replacement of a failed product**

6.6    If Safety Vision were able to establish (a) a defect in workmanship or materials and/or (b) that the product failed to conform to the specifications, Safety Vision's sole remedy is included in the ODM Agreement:  "If the Product does not operate as warranted above, [Safety Vision]'s sole remedy shall be, at LEI's option, repair or replacement."

6.7    Safety Vision has not alleged LEI failed to replace or repair failed components.  Safety Vision's expert concedes, "LEI was repairing and/or replacing failed components…"  Ex. C, p. 6. Safety Vision claims LEI was required to do more than repair and/or replace failed components, despite the clear terms of the contract.  *See* Ex. A.  Hubbell claims LEI, "failed to support [Safety Vision] in completing a collaborative analysis of the equipment provided by LEI to determine the causal factors of the component failures, the root cause of those failures and an action plan to

eliminate those causal factors leading to the component failures." No such duties are included in the ODM Agreement. *Id.* As such, the failure of LEI to perform these tasks cannot be a breach of contract.

**C. Safety Vision breached the agreement by failing to tender payment of $244,927.70 for products accepted.**

6.8 Section 7.1 of the ODM Agreement provides, "[s]ubject to acceptance of Products in conformity with the Purchase Order and the specifications as provided for in this Agreement, invoices shall be due 40 days after receipt from LEI or 1% net 10 days." Ex. A, §7.1.

6.9 Section 10.5 provides Safety Vision has the right to inspect delivered products to ensure it conforms to the Purchase Order and specifications, provided Safety Vision complete the inspection within 30 days after physical receipt of a shipment ("the Inspection limited time"). Ex. A §10.5. Section 10.5 further provides, "[a]ny delivery will be deemed fully accepted by [Safety Vision] if [it] does not notify to LEI of any nonconformity within 10 days from the last Inspection limited time.[2]

6.10 LEI shipped products to Safety Vision under Purchase Orders 1208698 and 1209677 from December 2020 to January 2021. Exhibit D, Declaration of Terence Chou, General Manager of LEI. Safety Vision did not reject any of the products shipped under these Purchase Orders. *Id.* The total amount owed under these Purchase Orders is $244,927.70. Safety Vision has failed to remit payment of $244,927.70 to LEI. *Id.*

6.11 On June 7, 2021, LEI formally demanded payment of the $244,927.70 from Safety Vision. Exhibit E, letter from Geoffrey Egger at LEI to Safety Vision. In response, Safety Vision initiated this lawsuit on June 14, 2021. Ex. A.

## VII.   PRAYER

**WHEREFORE, PREMISES CONSIDERED,** Defendant LEI Technology Canada respectfully prays the Court

---

[2] Any alleged defect in the product discovered after the Inspection limited time is controlled by Section 11 of the ODM Agreement, discussed *supra*.

1. Grant this Motion for Summary Judgment;

2. Enter a summary judgment dismissing with prejudice all claims against Defendant LEI Technology Canada by Plaintiff Safety Vision, LLC;

3. Enter final summary judgment against Safety Vision, LLC in favor of LEI Technology Canada in the amount of $244,927.70.

4. Award LEI Technology Canada costs of court from Safety Vision, LLC; and

5. Award LEI Technology Canada all other relief to which they may be justly entitled.

Respectfully submitted,

**HARTLINE BARGER LLP**

By: */s/ Staci M. Vetterling*
　　Darrell L. Barger
　　Texas Bar No. 01733800
　　dbarger@hartlinebarger.com
　　Staci Vetterling
　　Texas Bar No. 24051059
　　Svetterling@hartlinebarger.com
　　1980 Post Oak Blvd., Suite 1800
　　Houston, Texas  77056
　　Phone:  (713) 759-1990
　　Fax: (713) 652-2419

**ATTORNEYS FOR DEFENDANT**
**LEI TECHNOLOGY CANADA**

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a true and correct copy of the above and foregoing instrument has been forwarded to all known counsel of record as listed below by the method of service indicated on this 19th day of June, 2023.

Patrick J. McGettigan
13625 Ronald Reagan Blvd.
Building One, Suite 100
Cedar Park, TX 78613
Phone: 512-476-1121
Fax: 512-476-1131
Email: pmcgettigan@inhousegc.com
*Attorney for Plaintiff*

 */s/ Staci M. Vetterling*
Staci Vetterling

# Exhibit

# A

# EXHIBIT A

### ODM Agreement between LEI Technology Canada and Safety Vision

This _ODM Agreement_ and the _Exhibits_ hereto (they are collectively referred to as "**Agreement**") is made and entered into on Date, ("Effective Date") by and between LEI Technology Canada, a company organized and existing under the laws of the British Columbia, with its head office at 3160A Orlando Drive, Mississauga, Ontario, Canada L4V 1R5, ("**LEI**") and Safety Vision, LLC, a Texas limited liability Company, a company organized and existing under the laws of Texas, with its address at 6100 West Sam Houston Parkway North, Houston, Texas 77041.

**Whereas**, LEI, through its parent company Lanner Electronics Inc, desires to design, manufacture and sell embedded computer systems and product outlined in Exhibit A, and Company desires to purchase such products as listed in Exhibit A ("Products") for Company's own use and for resale under Company's label(s), pursuant to the terms and conditions of this Agreement.

**Now, therefore,** subject to the terms and conditions set forth herein below, the parties hereto agree as follows:

1. **SCOPE OF AGREEMENT**

    1.1. Unless otherwise agreed by both parties in writing, this Agreement applies to all purchase orders and other documents of purchase (hereinafter collectively referred to as "Orders") which Company may place with LEI for Products after the Effective Date of this Agreement. LEI specifically agrees that the terms and conditions of this Agreement shall apply to any Order, whether or not this Agreement or its terms and conditions are expressly referenced in the Order.

    1.2. Unless otherwise agreed by both parties in writing for a specific transaction, no inconsistent or additional term or condition in any Order shall be applicable to a transaction within the scope of this Agreement. Both parties specifically agree that any terms and conditions on any of their purchase or sale documents used as Orders hereunder, which are in any way inconsistent with this Agreement, shall be inapplicable and the terms of this Agreement shall govern.

    1.3. The parties agree to use reasonable efforts to place a legend on each Order within the scope of this Agreement substantially as follows:

    1.3.1. All Orders are subject to the provisions of the ODM Agreement. This Agreement shall, however, apply to any Order under its terms regardless of whether any such legend shall have been placed on the Order.

2. **GENERAL TERMS AND CONDITIONS**

    2.1. **Purchase Orders.** Purchase Orders will normally be limited to the Product covered in Exhibit A attached hereto. Purchase Orders may, however, be issued for Product produced by LEI which are not covered in Exhibit A. In such event, the presumption will be that the terms and conditions of this Agreement apply to any such Purchase Order unless LEI notifies Company, prior to accepting such Purchase Order, of its objection to having such Product covered under this Agreement.

3. **DEFINITIONS**

    3.1. **Product:** The term "Product" means the products described in Exhibit A and any other products provided to Company by LEI under this Agreement and related equipment and any revisions, enhancements and options thereto made available by LEI with Company consent.

    3.2. **Purchase Order**: The term "Purchase Order" means the formal order issued by Company for the purchase of Product. The Purchase Order shall identify the following items:

    3.2.1. Identification of Product by model or part number,

    3.2.2. Quantity requested;

    3.2.3. Unit Price;

    3.2.4. Shipment instructions, including requested carrier, delivery schedule and destination;

    3.2.5. Payment arrangements;

3.2.6. Reference to the terms and conditions of this Agreement.

3.3. **Unit Price**: The term "Unit Price" shall mean the applicable unit price set forth in Section 5 of this Agreement. All Unit Prices are based on FOB Taiwan.

3.4. **Non-recurring Engineering (NRE) Charge**: The term "NRE charge" means any charge for customization of the Products requested by Company. There shall be no NRE charge for the Products as described in Exhibit A. The NRE charge will be based on rates as negotiated and agreed upon between LEI and Company prior to any engineering or other task being performed that would give rise to such charge.

3.5. **Prototype:** The term "prototype" means the first sample products from manufacturing for testing purposes.

3.6. **Gold Sample:** The term "Gold sample" means product ready units, as approved by customer.

## 4. RIGHT TO SELL

4.1. Subject to the terms and conditions of this Agreement, LEI hereby grants Company exclusive rights, only to Products identified in Exhibit A, to sell the Products to worldwide markets, and Company accepts such rights.

## 5. PRICING

5.1. Company agrees to pay the unit price as described in Exhibit A. Charges for these components will be negotiated in good faith based on market rates or, if available, negotiated discounts from LEI's suppliers.

5.2. The above pricing is guaranteed for a period of 3 months from date the initial production Purchase Order from customer is accepted by LEI or, the delivery of product under an agreed to purchase order, whichever is greater. After which the parties shall negotiate in good faith the prices for any subsequent periods. It is agreed that Company may issue separate purchase orders for the NVR, hard drives and memory.

5.3. The minimum quantity for each production order and purchase order will be 200 units.

5.4. The NRE charge for engineering work is outlined in Exhibit B.

5.5. The production and testing procedures are based on Lanner's Standard manufacturing and testing procedure. Any special and/or additional testing requirement needed by Company, e.g., a request pursuant to Section 9.2, will result in additional cost to the Unit Prices. If a request by Company would entail any such additional costs, LEI will notify Company of these costs and provide Company with an opportunity to modify its request prior to such costs being charged to Company.

5.6. Any changes and/or adjustments to the specifications within Exhibit A or any Addendum to Exhibit A could result in NRE charges to Company.

## 6. PURCHASE ORDERS AND ORDERING PERIOD

6.1. **Supply**: LEI agrees to supply the Products to Company and to accept purchase orders for the Products from Buyer under the terms and conditions of this Agreement.

6.2. **Purchase Order and Acceptance**: Purchase Orders shall identify the product and quantities ordered and shall specify a delivery date in accordance with LEI's ninety (90) day lead time. Should Company agree to the purchase of the necessary NC/NR components based on a six (6) month forecast, the lead time will be reduced to sixty (60) days. Purchase Orders must be made in writing, delivered via facsimile or email to LEI. LEI shall promptly acknowledge such Purchase Orders, including identification of the Product and quantities ordered and the delivery date, no later than three (3) working days from receipt of Purchase Orders.

6.3. **Emergency Orders**: Company may request emergency orders and emergency shipment at Company's expense. LEI shall use its best efforts to fill such orders and shall negotiate in good faith any additional costs.

## 7. PAYMENT

7.1. Subject to acceptance of Products in conformity with the Purchase Order and the specifications as provided for in this Agreement, invoices shall be due 40 days after receipt from LEI or 1% net 10 days. Payment for the Products shall be in US currency and shall be made by wire transfer to LEI's designated bank account.

## 8. RESCHEDULING, CANCELLATION AND ECOs

8.1. **Purchase Order Changes**: All Purchase Orders less than sixty (60) days of delivery shall be considered NC/NR purchases. Delivery quantities for Purchase Orders from sixty (60) to ninety (90) days from delivery may be changed by 25% and delivery quantities for Purchase Orders more than ninety (90) days from delivery may be changed by 100%.

8.2. All of Company's changes to Purchase Orders shall be submitted in writing to LEI. All such changes shall be likewise confirmed by LEI in writing.

8.3. Notwithstanding anything herein to the contrary, for any Product canceled by Company for which LEI purchased components that are described as NC/NR in Exhibit C hereto in quantities pre-approved by Company in writing (including email), Company shall reimburse LEI for all costs of the pre-approved NC/NR components reasonably incurred by such cancellation. The provisions of this Section 6 shall survive any termination of this Agreement with respect to Purchase Orders issued prior to such termination.

8.4. **Engineering Change Orders**: Engineering change orders ("ECO's) for the Products will be controlled by Company . LEI agrees not to make any hardware engineering change to the Products without written approval from Company.  LEI will provide Company with sufficient information for Company to track all approved ECOs.

## 9. MANUFACTURING

9.1. Company agrees that LEI will manufacture the product at Lanner's factory or LEI's chosen factory(s) after Company has approved such facility(s). LEI may not move the production of specified products without the written consent and formal audit by Company's manufacturing engineering group.

9.2. Company may require that LEI install/include Company software provided to LEI in the Products prior to shipment to Company. If Company requires such installation, subject to the terms and conditions of this Agreement, Company hereby grants to LEI a non-exclusive, non-transferable license to use and reproduce the Company Software, in object code only, for the sole purpose of embedding or including the Company Software into Products for sale to Company  during the Term of the agreement.  The foregoing sets forth the entirety of LEI's rights to use, distribute and otherwise deal with the Company Software.  Company hereby reserves without restriction all rights to the Company Software not expressly granted to LEI in this section.  Without limiting the generality of the foregoing, LEI will use the Company Software solely for the purpose described in this section and in accordance with the following: LEI will not modify, reverse engineer, disassemble or decompile any Company  Software, will not prepare derivative works from any Company Software, or attempt to discover any portion of the source code or any trade secrets with respect to any Company Software and will not distribute any Company Software except Company Software included/installed in Products sold to Company.

## 10. DELIVERY, TITLE AND SHIPMENT

10.1. **Trade Term**: Delivery will be made FOB Taiwan. Delivery shall occur on the date of handover to the Company's designated forwarding agent. Company will pay all delivery cost and charges.

10.2. **Delivery**: Delivery will be made either on the date specified on the Company's Purchase Order, subject to Section 6.1.

10.3. **Title**: Title for the Product, except as to software, and risk of loss or damage shall pass to the Company as of delivery.

10.4. **Shipping**: All Product delivered pursuant to the terms of this Agreement shall be suitably packed for shipment marked for shipment at Company 's address set forth as below or specified in Company 's Purchase Order, and delivered to a carrier or forwarding agent chosen by Company. Should

Company fail to designate a carrier, forwarding agent or type of conveyance in its Purchase Order to LEI, LEI shall make such designation in conformance with common commercial shipping practices.

**10.5. Inspection:** Company has the right to inspect delivered Product to ensure it conforms to the Purchase Order, specifications contained herein and to such other specifications as the parties agree to in writing (the "Inspection Standards"), provided, however, that Company must finish such inspection within 30 days ("Inspection limited time") after physical receipt of the shipment by Company. Any delivery will be deemed fully accepted by Company if does not notify to LEI of any nonconformity within 10 days from the last Inspection limited time. If any Product does not meet the Inspection Standards, Company shall notify LEI to that effect, and has the right to reject any non-conforming Product of the particular delivery and deduct the non-conforming Product from the order. LEI will be responsible for the return freight and associated costs for any non-conforming products.

## 11. WARRANTY

### 11.1. Hardware:

**11.1.1.** LEI warrants the hardware portion of its Products to be free of defects in workmanship and materials and to conform to the specifications contained herein and to such other specifications as the parties agree to in writing, under normal use and service, for 12 months from the date of delivery to Company. Company may purchase at time of order extended warranty , at rates and durations negotiated and agreed to by both parties.

**11.1.2.** If a Product does not operate as warranted during the applicable warranty period, LEI shall, at its option and expense, (1) repair the defective product or part, (2) deliver to customer an equivalent product or part to replace the defective item. All products that are replaced will become the property of LEI. Replacement products must be new. Any replaced or repaired product or part has a warranty with coverage as described in Section 11.1.1 for ninety (90) days from delivery to Company or for the remainder of the initial warranty period, whichever is longer.

**11.1.3.** LEI shall not be responsible for any software, firmware, information, or memory data of customer contained in, store on, or integrated with any product returned to LEI pursuant to any warranty.

**11.1.4.** Procedures: Warranty service may be obtained by contacting a LEI office within the applicable warranty period for a Return Material Authorization (RMA) number. Once an RMA number is issued, the defective product must be shipped back to LEI prepaid, insured and wrapped in the original and similar shipping package to ensure that it will not be damaged during shipment. When returning the defective product to LEI for service, the RMA number must be marked on the outside of the shipping package. Any product returned without an RMA number shall be rejected and sent back to the Company, and LEI reserves the right to have Company bear the cost of sending back such products. Transportation costs, if any, incurred in connection with the return of a repaired or replaced item to Company shall be borne by LEI; provided that, such costs shall be borne by Company if LEI reasonably tests and determines that the item is conforming. If LEI determines, in its reasonable discretion, that the allegedly defective item is not covered by the terms of the warranty provided thereunder or that a warranty claim is made after the warranty period, the cost of repair by LEI, including all shipping expenses, shall be reimbursed by Company within thirty (30) days upon receiving LEI's written notice.

### 11.2. Warranties exclusive:

**11.2.1.** If the Product does not operate as warranted above, the customer's sole remedy shall be, at LEI's option, repair or replacement. The foregoing warranties and remedies are exclusive and are in lieu of all other warranties, expressed or implied, either in fact or by operation of law, statutory or otherwise, including warranties of merchantability and fitness for a particular purpose. LEI neither assumes nor authorizes any other person to assure for it any other liability in connection with the sale, installation maintenance or use of LEI's Product.

**11.2.2.** The foregoing warranties and remedies are for Company's exclusive benefit. Any and all warranties shall be void as to Product components damaged or rendered unserviceable by: (1) the customer's or any third person's misuse, neglect, improper installation or testing; or (2) fire, water, accident, lightning or other peril; or (3) unauthorized attempts to repair.

## 12. OUT-OF-WARRANTY REPAIR

12.1. Upon request of Company, LEI shall repair or replace out-of-warranty Product at a reasonable charge to Company. Such request shall provide LEI with a detailed description of the defect. At LEI's request, Company shall permit LEI to be present for, and participate in, any of Company 's inspections or tests and shall provide LEI with reasonable access to Company 's test results and test related information. All replaced parts become the property of LEI.

## 13. PRIVATE LABEL

13.1. All Product sold by LEI to Company hereunder shall be provided to Company in the color and with such markings and identification, which may include the trademark(s) and/or trade-name, service-mark(s) or logo of Company (the "Company Trademarks"), on the Products as Company may request. Such markings and identification shall be strictly in accordance with the requirements of Company as provided to LEI and as may be updated from time to time by Company. LEI is not authorized to use the Company Trademarks on any products, other than Products ordered by and delivered to Company, or for any other purpose, and LEI agrees not to use any name, marks, logos, designs or artwork that are confusingly similar to the Company Trademarks in any context except as authorized in writing by Company. LEI is hereby granted a limited trademark license with respect to the Company Trademarks set out in the above-mentioned markings and identification, solely for the above-mentioned use. All other use is prohibited. This license shall terminate on the termination of this Agreement. LEI shall obtain no rights to or interest of any kind in any of Company's trademarks or trade-names other than the limited rights to use set out above. Such private labeling shall be provided at Company's expense, with the exception of color. LEI will supply Product with the color as designated by Company at no additional expense. If Company requests that LEI produce any of the labeling described above, NRE charges will be incurred for such work. No permission is granted to Company to use LEI's trademarks, trade names and service marks apart from the incidental appearance of such trademarks, trade names and service marks on the Product, Software or Documentation.

## 14. PRIVATE LABEL LIABILITY

14.1. Company will defend LEI against any proceeding based upon any third party claim that a Company Trademark infringes upon a U.S. trademark. Further, Company will: indemnify LEI against any and all damages, costs and attorneys' fees awarded against LEI in connection with such proceeding as a result of any such noncompliance; reimburse the expenses reasonably incurred by LEI to provide any assistance requested by Company in defense of the proceeding; and, if the action is settled, pay any amounts agreed to by Company in settlement of any claims based upon such noncompliance. Company 's obligations under this section are subject to LEI notifying Company of the proceeding promptly after it is commenced; LEI tendering sole control of the defense of the proceeding to Company; LEI providing such assistance in defense of the proceeding as Company may reasonably request; and LEI complying with any court order or settlement made in connection with the proceeding. The foregoing sets forth LEI's sole remedy and Company's entire liability for all infringement by and infringement warranties regarding the Company Trademarks.

## 14a. Exclusivity

15.1    Seller and Buyer agree that the only products identified in Exhibit A, will be exclusive to Buyer.

Seller shall not sell the products identified in Exhibit A to any party except Buyer without Buyer's prior written consent, which consent may be withheld in Buyer's sole and absolute discretion. Buyer shall not be restricted as to its sale or use of the Products purchased hereunder including, without limitation, worldwide marketing to any end user or remarketer, and use by Buyer for its benefit or for the benefit of others. In

addition, this Agreement shall not prevent Buyer from acquiring any products similar to or related to the Custom Products from any other source.

## 14b  INDEMNITY

15.1 Except for the Company Trademarks and items considered to be intellectual property of Company, if the Products purchased from LEI under this Agreement infringe or to be alleged to infringe any patent, registered design, copyright or other intellectual property right, LEI shall indemnify Company against all claims, damages, expenditure (including legal fees and the cost of litigation) and liability which Company may sustain or incur by reason of or in connection with such infringement or alleged infringement.

15.2 Notwithstanding subsection 15.1, if Company modifies any software provided with the Products and such modification is the cause of any infringement, Company shall be solely liable for such infringement.

## 15  OWNERSHIP OF INTELLECTUAL PROPERTY

15.1 Intellectual property as used herein includes without limitation a party's interests in ideas, inventions, patents, copyrights, trade secrets and know-how. Each party shall own the intellectual property that party has created and, except for the limited licenses expressly contained herein, no intellectual property rights are transferred to or retained by any party under this Agreement or by use of any patent or other intellectual property right under this Agreement. The parties recognize and agree that there are not currently anticipated any development activities which would result in Company having any intellectual property interest in any Product, other than the limited licenses expressly provided for herein. The provisions of this Section 16 shall survive any termination of this Agreement. Intellectual property owned by Company is listed in Exhibit D.

## 16  TERM

16.1 **Term**: This Agreement shall commence as of the Effective Date unless earlier termination pursuant to Section 17.2, and shall continue for a term of one (1) year, and shall automatically renew for successive periods of one year, unless otherwise specified herein or unless terminated sooner under the provisions set forth herein. Termination shall not excuse either party from payment of amounts owed to the other party prior to termination.

16.2 Termination:

16.2.1   Company shall have the right to terminate this Agreement without cause upon ninety (90) days notice to LEI.

16.2.2   LEI shall have the right to terminate this Agreement without cause upon 270 days notice to Company; provided, however, that such notice may not be given until after the first year following the Effective Date. Upon termination, LEI will transfer all IP as outlined in 9.2.

16.2.3   Either party shall have the right to terminate this Agreement for cause as a result of the failure of the other party to perform any material term or condition of this Agreement and to remedy such failure within thirty (30) days after written notice of such failure given by the non-defaulting party; provided, however, that if LEI terminates this Agreement according to this Section 17.2.2, such termination shall not be effective until 180 days following the end of the cure period.

16.3 **No Liability For Expiration or Termination:**  Neither LEI nor Company shall, by reason of the expiration or termination of this Agreement in accordance with its terms, be liable to the other for compensation, reimbursement or damages on account of any loss of prospective profits or anticipated sales or on account of expenditures, investments, leases, or commitments made in connection with this Agreement or the anticipation of extended performance thereunder.

16.4 **Survival:** The provisions of Sections 7, 11, 13, 14, 15, 16 and 18 shall survive any termination or expiration of this Agreement.

## 17   MISCELLANEOUS

17.1 **Assignment:**  This Agreement and all rights and obligations thereunder, are personal to the parties hereto and may not be assigned in whole or in part by either party without the prior written consent of the other; provided, however, that either party may assign this Agreement in conjunction with the merger, reorganization, or the sale of all or substantially all of its assets to which this Agreement pertains.  Notwithstanding above, this agreement shall be binding upon the parties hereto and their permitted successors and assigns

17.2 **Confidentiality:**  The parties agree to comply with the terms and conditions of the AAA Technologies, Inc. Mutual Nondisclosure Agreement between the parties with respect to any confidential information provided under this agreement.

17.3 **Waiver of Consequential Damages:**  In no event will either party's liability of any kind arising out of this Agreement, regardless of the form in which any legal or equitable action may be brought, include any costs of procuring substitute goods or services or any special, incidental, indirect or consequential damages, however caused, even if such party has knowledge of this possibility of the potential loss or damage and notwithstanding any failure of essential purpose of any limited remedy.

17.4 **Waiver:**  Except as specifically provided in a waiver signed by a duly authorized officer of the party seeking enforcement, the failure to enforce or the waiver of any term of this Agreement shall not constitute the waiver of such term at any time or in any circumstance and shall not give rise to any restriction nor condition to the prompt, full and strict enforcement of the terms of this Agreement.

17.5 **Notices:**  All notices, waivers and consents in connection with this Agreement shall (except as otherwise provided for herein) be in writing and shall be deemed given when delivered by hand or received by certified mail, postage prepaid, return receipt requested, by telex or facsimile transmission. All notices or communications between Company and LEI pertaining to this Agreement shall be addressed as follows:

- If to Safety Vision, LLC
- Safety Vision, LLC
- 6100 West Sam Houston Parkway North
- Houston, Texas 77041
- Attn:  Bruce Smith

- If to LEI :
- LEI Technology Canada Ltd.
- 3160A Orlando Drive
- Mississauga, L4V 1R5
- Attn: Geoffrey Egger

17.6 **Entire Agreement:**  This Agreement, including any Exhibits, schedules and tables attached hereto which either have been specifically referred to herein or have been initialed by the parties constitute the entire Agreement between the parties with respect to the subject matter. This Agreement supersedes all prior discussions, understandings and agreements with respect to the subject matter and shall take precedence over any conflicting terms in a Purchase Order and over any terms in LEI's order acknowledgment form.

17.7 **Choice of Law:**  This Agreement shall be governed by and construed in accordance with the laws of the State of Texas, without reference to its choice of law rules. Any claim or litigation brought under or relating to this Agreement shall be brought in a court of competent jurisdiction located in Harris County, Texas.

17.8 **Amendments:**  This Agreement may be amended or supplemented only in writing designated as such an amendment or supplement and signed by a duly authorized officer of the parties.

17.9 **References:** The paragraph headings and the recitals used herein are for convenience of reference only and shall not alter or affect the terms, or interpretation, of this Agreement.

17.10 **Force Majeure:** Neither LEI nor Company shall be liable to the other for any default thereunder if such default is caused by an event beyond such party's control, including without limitation acts or failures to act of the other party, floods, fires, governmental acts or directives, component shortages, abnormal cost increases thereof, unavailability of transportation, strikes and acts of God (collectively known as a "Force Majeure Event"). In the event of a threatened default or default as a result of any of the above causes, the defaulting party shall exercise its best efforts to avoid and cure such default.

17.11 **Counterparts:** This Agreement may be executed in two or more counterparts, each of which shall be deemed an original and all of which together shall constitute one and the same agreement

17.12 **Publicity:** Each party and their representative shall not issue or cause to be issued publication of any press release, public announcement of other public statement with respect to the transactions contemplated by this Agreement without the prior written consent of the other party, which consent shall not be unreasonably withheld..


In witness whereof, the undersigned, being duly authorized, have executed this Agreement as of the day and year set forth as below.

**LEI Technology Canada**                                    **Safety Vision, LLC**


(Name in Print)  GEOFFREY EGGER                    Michael Ondruch

(Title)  GENERAL MANAGER                            Chief Financial Officer

(Date)  JAN -12- 2016                               January 11, 2016

**Exhibit A**

I. Custom Products

LVR-6000-SV1: As Per Preliminary Specification:

LVK-HDDTRAY-SV1: As Per Preliminary Specification:

 SPEC

II.      Product Pricing (USD)

LVR-6000-SV1 as per specifications attached.

| | |
|---|---|
| Unit Price – initial 1,000 unit purchase price includes prorated Certification fees | $1944.00  USD |
| Unit price – after 1,000 units | $1906.00 USD |
| LVK-HDDTRAY-SV1 | $177.00 USD |

**Exhibit B**

The charge for engineering work and certifications as identified herein will not exceed, unless agreed by both Parties, $58,000. Certification charges will be prorated, on a per unit basis, in the cost of the first 1,000 units.

I.      NRE Pricing (USD)

| Item Price | Description | QTY. |
|---|---|---|
| NRE $20, 000 | System Design –NRE charge | 1 |

With 1 working system prototype; lead time 10 weeks from NRE paid.

II.     Certifications (USD)

| Item Price | Description | |
|---|---|---|
| EN-50155 $22,000 | Rolling stock standard for railway applications | |
| | 6 Weeks from test unit applied | |
| CE/FCC | Conformité Européenne Standard / Federal Communications Standard | $3,000 |
| | 6 weeks from test unit applied | |
| E-Mark Certification $12,000 | | |
| | 6 weeks from test unit applied | |
| MIL-STD-810G-Vibration $600 | | |
| | 4 weeks from test unit applied | |
| MIL-STD-810G-Shock $1000 | | |
| | 4 weeks from test unit applied | |

**Exhibit C**

I.      NC/NR

LV-5700-SV1 including all components shall be deemed as NC/NR as per 8.3.

**Exhibit D Company Intellectual Property**

# Exhibit

# B

6/14/2021 5:08 PM
Marilyn Burgess - District Clerk Harris County
Envelope No. 54400770
By: Marcella Hill
Filed: 6/14/2021 5:08 PM

CAUSE NO. _____

| | | |
|---|---|---|
| SAFETY VISION, LLC | § | IN THE DISTRICT COURT OF |
| | § | |
| | § | |
| VS. | § | HARRIS COUNTY |
| | § | |
| | § | |
| LEI TECHNOLOGY CANADA AND | § | |
| LANNER ELECTRONICS, INC. | § | |
| | § | ____ JUDICIAL DISTRICT |

## PLAINTIFF'S ORIGINAL PETITION

TO THE HONORABLE JUDGE OF SAID COURT:

Plaintiff, SAFETY VISION, LLC, files this Original Petition, and as grounds therefor would respectfully show unto this Court the following:

### I.

### DISCOVERY

1.      Plaintiff intends to conduct discovery under Level 2 of the Texas Rules of Civil Procedure.

### II.

### PARTIES

2.      Plaintiff, SAFETY VISION, LLC ("SV") is a Texas limited liability company with its principal place of business and home office at 6100 West Sam Houston Parkway North, Houston, Harris County, Texas 77041.

3.      Defendant, LEI Technology, Ltd. ("LEI") is a business entity who, among other things, entered into contracts with Texas residents and Texas companies which are performable, in whole or in part, within the State of Texas. As far as known to Plaintiff, upon information and

1

belief, Defendant does not maintain a regular place of business in Texas in Harris County, Texas. or a designated agent for service of process. The claims asserted herein arise out of business done by Defendants in the State of Texas.

4.     Defendant Lanner Electronics, Inc., (" Lanner") is the parent company of LEI and may be served in the same manner and place as Defendant LEI.

5.     The parties contemplated that the products designed, manufactured and sold by LEI would be and were in fact delivered to Plaintiff and would be performable and, in fact, were performed in whole or in part in Texas. Accordingly, LEI may be served with process pursuant to TEX. CIV. PRAC. & REM. CODE §17.041 et seq. by serving its agent for service, being the Secretary of State for the State of Texas, 1019 Brazos Street, Austin, Travis County, Texas 78701.

6.     Plaintiff requests that the District Clerk issue duplicate copies of non-resident citation ("Citation") for each named Defendant for service upon the Texas Secretary of State, at 1019 Brazos Street, Austin, Texas 78701. Plaintiff further requests that, upon receipt of the Citation, the Texas Secretary of State shall forward by registered or certified mail, return receipt requested, such process by serving the President or Vice-President of Lanner Electronics, Inc. at 3106 A Orlando Drive, Mississauga, Ontario, Canada L4 V_IR5.

7.     LEI may be served with process by delivering a copy of the citation and of the Petition to its chief executive officer or it's President at LEI's designated business address at 3106 A Orlando_ Drive, Mississauga, Ontario, Canada L4 V_IR5. Alternatively, LEI may be served with process at that address by registered mail or certified mail, return receipt requested, delivery restricted to addressee or upon such other authorized person of LEI.

7.     The claims asserted herein are out of business done by Defendants in the State of Texas. SV signed the Agreement (that is the subject of this suit) in Texas and the parties

contemplated that the services and goods delivered by Defendants would be performable and, in fact, were performed in Texas.

## III.

## JURISDICTION

8.     This Court has jurisdiction over the lawsuit because the amount in controversy exceeds this Court's minimum jurisdictional requirements.

9.     Additionally, this Court has jurisdiction over Defendants, each a nonresident, because Defendants purposefully availed itself of the privileges and benefits of conducting business in Texas by (a) transacting business in Texas and by entering into a contract with Plaintiff[1], a Texas business in Texas; and (b) by contracting with others in the State of Texas for the purpose of soliciting sale orders for the purchase and delivery of its products within the State of Texas.

## IV.

## VENUE

10.     Venue is proper in Harris County, Texas, because this is the county in which Plaintiff's principal place of business and home office, and this is the county in which all or a substantial part of the events or omissions giving rise to the claims occurred. In addition, pursuant to the terms of the *ODM Agreement* by and between Plaintiff and Defendant dated January 16, 2016, Defendants consented, in writing, to the personal and subject matter jurisdiction of the State of Texas, and to venue in Harris County, Texas. [2]

---

[1]  See, *ODM Agreement* by and between Plaintiff and Defendant dated January 16, 2016.

[2]

17.7 **Choice of Law:**  This Agreement shall be governed by and construed in accordance with the laws of the State of Texas, without reference to its choice of law rules. Any claim or litigation brought under or relating to this Agreement shall be brought in a court of competent jurisdiction located in Harris County, Texas.

## V.

## <u>FACTUAL BACKGROUND</u>

11.    SV manufactures, markets, installs, distributes and sales a broad range of products including video equipment, primarily to mass transit, law enforcement, pupil transportation, first responders and trucking markets and other related industries.

12.    LEI and Lanner engineer, design and manufacture computer embedded hardware equipment and custom OEM hardware services for a wide variety of industries, including the mobile video industry.

13.    In connection with its core business, SV provides hardware and software solutions for video mobile products and equipment to its customers, and as a component thereof, promotes strategic placement and sales of its products in certain specialized markets and venues, directly or with other product lines.

14.    SV has been in the business of promoting and selling multiple product lines as an independent sales representative and distributor of mobile cameras and surveillance systems dating back to 1993 and has developed customer relationships on a national and international scale dating back 29 years, long before the Agreement that is the subject of this lawsuit was entered into.

15.    The lawsuit is necessitated as a result of the sudden, unilateral action by LEI (or its purported assigns) on June 11, 2021 when it wrongfully demanded payment from SV claiming a purported balance of approximately $ 244,928.   This letter was several months (more than 90 days) of LEI's refusing and persistent failing to acknowledge the claims of SV for product defects and assorted failures with estimated costs and damages to SV, which sum is far above any amounts Defendants (or its assigns) claim is due and owing.

16.     This lawsuit is about enforcing the Agreement dated January 16, 2016 incorporated herein by reference as Exhibit A.

17.     SV has been seriously aggrieved as a result of LEI's refusal and failure to cure the manufacturing and design defects in the product it sold to SV and the associated costs and damages suffered by SV.

18.     Documents to substantiate the basis or ground for the relief and remedy sought hereunder include the numerous emails, purchase orders and Agreement, and other like internal documents in the possession of LEI.

19.     In addition, SV sent a letter dated March 11, 2021 to LEI to which LEI did not reply. This letter provided LEI an opportunity to abide by the Agreement and cure the ongoing problems and to pay SV for the costs it incurred to make the product work. Again, LEI chose not to do so.

20.     Without a reply from LEI and assurances to abide by the terms and spirit of the Agreement, SV is left no choice but to protect its rights by filing this lawsuit

## VI.

## CAUSES OF ACTION

### Breach of Contract

21.     Defendants agreed to make, engineer, design and manufacture the custom product/equipment in a good and workmanlike manner so that it would operate and function without material fault.  In this connection, Defendants have failed and refused to comply with its obligations under the Agreement and continue to ignore and refuse to pay to Plaintiff the sums it has incurred for the defects and shortcomings in the product Defendants engineered, designed and manufactured and delivered to Plaintiff, thereby causing additional and ongoing damages to

Plaintiff in an unspecified amount.   The actions of said Defendants as described hereinabove constitute breach of contract, which proximately caused damages to Plaintiff as described herein, for which Plaintiff hereby sues.

In addition to the foregoing, the Agreement is a personal services contract and is not assignable. Any assignment of the Agreement is invalid, and void as a matter of law.

## Declaratory Judgment

22.     To the extent it becomes necessary to give full effect to the Agreement, SV would show that it is interested under a written contract or other writings constituting a contract (*i.e.*, the Agreement); or whose rights, status or other legal relationships are affected by a contract (*i.e.*, the Agreement); and that a justiciable controversy exists between the parties which can be resolved via a declaratory judgment.  Accordingly, SV is entitled to declaratory relief under the Declaratory Judgments Act and seeks a declaration as to the parties' rights, status or other legal relationships arising under the Agreement, including, *inter alia*, the enforceability of the Agreement in accordance with its terms and applicable law and the non-assignability of the Agreement.

## Attorneys' Fees

23.     Plaintiff is entitled to recover all of its costs and reasonable and necessary attorneys' fees pursuant to Chapter 38 of the TEX. CIV. PRAC. REM. CODE.

## VII.

## CONDITIONS PRECEDENT

24.     Plaintiff would show that all conditions precedent to its right to recover as herein alleged, if any, have occurred, have been performed, or have been waived or excused.

## VIII.

## REQUEST FOR DISCLOSURE

25.    Plaintiff requests that Defendant disclose, within 50 days of the service of this request, the information or materials described in Rule 194.2 T.R.C.P.

## IX.

## PRAYER

WHEREFORE, PREMISES CONSIDERED, Plaintiff, Safety Vision, LP, seeks judgment against Defendants, LEI Technology Canada and Lanner Electronics, Inc., for an amount in excess of the minimum jurisdictional limits of the Court, together with interest therein at a statutory rate prior to judgment; post-judgment interest at a maximum legal rate provided by law, all costs of Court and reasonable attorneys' fees, including attorneys' fees for any and all appeals; and for all such other and further relief to which the Plaintiff may be justly entitled.

Respectfully submitted,

By:    /s/Patrick J. McGettigan
Patrick J. McGettigan
SBOT#13624500
13625 Ronald Reagan Blvd.,
Building One, Suite 100
Cedar Park, TX 78613
(512) 512-748-8371 Cell
(512) 476-1121 Office
(512) 476-1131 Facsimile
pmcgettigan@inhousegc.com

ATTORNEY FOR PLAINTIFF

# Exhibit
# C

# SAFETY VISION, LLC
# VS. LEI AND LANNER






September 30, 2022

## Contract Conformance / Latent Defects

Prepared for Safety Vision, LLC

Review, analysis and professional opinions of Michael Hubbell





# TABLE OF CONTENTS

I.    PROJECT OVERVIEW ......................................................................................... 2
   Background ........................................................................................................ 2
   Project Scope ..................................................................................................... 3
   Project Approach ............................................................................................... 3
   Project Team ...................................................................................................... 3
   Compensation Statement ................................................................................... 4

II.   OBSERVATIONS / CONCLUSIONS ................................................................ 4
   Project Observations ......................................................................................... 4
   Project Conclusions .......................................................................................... 6

III.  OPINIONS ......................................................................................................... 7

IV.   EXHIBITS .......................................................................................................... 7
   Exhibit A – Resume / Michael Hubbell ........................................................... 8
   Exhibit B – Reviewed Documents List .......................................................... 10

          Lone Star Transit Asset Management, LLC



# Safety Vision, LLC vs. LEI Technology Canada and LANNER Electronics, Inc./ RR 8000; Cause No. 4-21-cv-03306

**CONTRACT CONFORMANCE / LATENT DEFECTS**

## I. PROJECT OVERVIEW

### Background

Safety Vision, LLC (herein after referred to as SV) is a global supplier of mobile video surveillance solutions to a myriad of industries including mass transit, student transportation and commercial trucking to name just a few.

In January 2016 SV entered into an agreement[1] with LEI Technology Canada and its parent company Lanner Electronics (herein after collectively referred to as LEI) to purchase Road Recorder 8000 mobile video recorders manufactured by LEI for SV's own use and resale to SV customers.[2]

Subsequent to the sale and installation by SV of Road Recorder 8000 mobile video surveillance solutions, mass transit customers of this system began reporting they were unable to retrieve recorded video from the system or the system was not recording images.

SV requested LEI to identify and resolve the issues leading to these system failures. While LEI did troubleshoot and effect repair and/or replacement of individual failed components, LEI was non-responsive to SV's request to identify the causal factors and the root cause(s) of the failures of the LEI-supplied components. And, the failures of the LEI-supplied components continued.

---

[1] ODM Agreement between LEI Technology Canada and Safety Vision – January 12, 2016
[2] Lanner Electronics Inc. Road Recorder 8000 Specifications – March 2, 2016


Lone Star Transit Asset Management LLC



To mitigate harm to its industry reputation and its future marketability of its products, SV sought and secured alternative sources for the components supplied to SV by LEI.  And, SV sent a letter to LEI requesting restitution of the monetary damages incurred by SV as a result of the latent failures of the LEI-supplied equipment.  These repeated requests made by SV as well as counter demands from LEI are currently the subject the referenced legal cause of action.

## Project Scope

I have been requested by SV and their legal counsel Patrick McGettigan, Esq. to review documents related to the OEM Agreement for the design and manufacturing of the RR8000 and opine, based on that review, as to whether the performance by LEI and Lanner was consistent with the many decades of my experiences within the public transit industry and my knowledge of public transit and technical problem solving best practices.

## Project Approach

I reviewed documents related to the creation of the business relationship between SV and LEI, the communications related to the failures experienced by SV and its customers of the LEI-supplied components, and the implementation and ongoing collaborative efforts of an action plan to mitigate the failures.  I analyzed the details and chronology of these documents, as well as researched industry best practices including methods for determining the causal factors leading to component failures and the process for developing resolutions utilizing root cause analysis procedures[3].  I also relied on my decades of practical experiences with overseeing the implementation and maintenance of the reliability of many electronic components/systems installed on transit bus and light rail cars, complex railroad right of way infrastructure and other transit-related service delivery infrastructure.

The documents I refer to in my analysis and in support of my conclusions and opinion are referenced in the EXIBIT B section of this report.

## Project Team



Lone Star Transit Asset Management, LLC (LSTAM) is based in Whitney, TX and was established in early 2018 as a certified WBE firm with the North Central Texas Regional Certification Agency.  In 2019, LSTAM achieved SBE certification with the Texas Department of Transportation.  LSTAM draws upon the decades of practical experiences of its two founders in the delivery of management and program consulting services to the transportation industry.  LSTAM is an SBE/WBE certified firm, fully insured and registered to conduct business in both the State of Texas and Florida.  For more information regarding the LSTAM, please visit www.lonestar-tam.com .

---

[3] https://evocon.com/articles/perform-root-cause-analysis/



## Compensation Statement

The compensation I will receive for consultations and testimony rendered during the course of this case is as follows:

$250 per hour – For review and analysis of documents and preparation of reports

$375 per hour – For preparation and providing deposition and/or testimony

Plus, reimbursement of any direct expenses incurred.

## II.   OBSERVATIONS / CONCLUSIONS

### Project Observations

The documents I reviewed, from the period of January 2016 through March 2021 depict the following key activities.  The sequence in which certain activities occurred are critical to my assessment of the continued good faith efforts of both parties to work towards an effective resolution of the latent and continuous failures of the LEI-supplied components.  Therefore, these observations are presented in chronological order and are summarized below:

<u>**January 2016**</u>

In January 2016 SV entered into an agreement with LEI Technology Canada and its parent company Lanner Electronics (herein after referred to as LEI) to purchase certain components manufactured by LEI for SV's own use and resale to SV customers.[4]  This agreement was the supply of two "custom products" identified as LVR-6000-SV1 and LVK-HDDTRAY-SV1.  Detailed in Exhibit B of this same agreement are charges for non-recurring engineering charges paid to LEI for modifications to the LEI equipment to fit the needs and intended purpose of SV and its mass transit customers.

These two components were modified by LEI and supplied to SV beginning in December 2016.[5]  SV incorporated these two components into the SV 8000 mobile video surveillance system and installed these systems in approximately 1,200 mass transit vehicles operated by various North American mass transit authorities.

---

[4] ODM Agreement between LEI Technology Canada and Safety Vision – January 12, 2016
[5] Safety Vision Payment Detail Report w/attachment – January 4, 2017

Lone Star Transit Asset Management LLC



## July 2018

Mass transit customers of this SV mobile surveillance system, including the network video recorder manufactured by LEI, began reporting to SV the inability to retrieve recorded video from the system or the system was not recording images.  SV initially responded to these reports by sending SV field technicians to troubleshoot the systems and to replace the failed components identified, including hard drives, power supplies and/or entire units.  All of which were manufactured and supplied to SV by LEI under the January 2016 agreement.

SV contacted LEI, sharing the customer reports of failure and the resultant SV field technician corrective action reports.  LEI did troubleshoot and repair and/or replace the failed components sent to them by SV and provided feedback to SV on the repairs performed to each of the failed components.  However, the failure rate of the LEI-supplied components continued, and the frequency of failure increased.

## August 2019

Beginning in 2019, SV initiated conversations with LEI regarding the qualitative and reliability issues experienced to date with the LEI-supplied components[6].  LEI was not responsive to these inquiries and continued to repair the individual defective components without identifying the causal factors and root cause(s) contributing to these component failures.  Attempts by SV to collaborate with LEI on identifying causal factors and root cause(s) of the failures continued through at least the end of 2019.[7]

## May 2020

In May 2020, SV attempted to engage LEI and eInfochips[8] by proposing a Memorandum of Understanding (MOU) to engage in detailed technical exploratory discussions in efforts to resolve the deficiencies of and to improve the reliability of the LEI-supplied components.[9]  This MOU was never signed by the parties.

---

6 Email and attachments from Bruce Smith, Safety Vision to Geoffrey Egger – September 19, 2019
7 Email exchanges between Richard Barrett, Safety Vision and Darren Khatib, Lanner – December 2019
8 eInfochips is a software engineering firm directly engaged by Safety Vision
9 Email and attachments from Michael Ondruch, Safety Vision to Darren Khatib, Lanner – May 18, 2020



**September 2020**

To mitigate further damages to its industry reputation and its future marketability of its products, SV sought and secured an alternative source[10] for the components supplied to SV by LEI. At SV's sole expense, it procured these alternatively sourced components and began replacing the LEI-supplied components with these alternatively sourced components. To date, SV has replaced approximately 400 of the 1,200 affected LEI-equipped systems.

**March 2021**

In March 2021, SV sent a letter to LEI recounting the actions to date, the lack of a permanent resolution by LEI and demanded restitution of the monetary damages incurred by SV as a result of the latent failures of the LEI-supplied equipment.[11]

## Project Conclusions

1. January 20216 agreement between SV & LEI includes provisions that LEI will warrant "… the hardware portion of its Products to be free of defects in workmanship and materials and to conform to the specifications contained herein and to such other specifications as the parties agree to in writing, under normal use and service …"

2. As evidenced by the non-recurring engineering charges billed by LEI, LEI was aware of the mass transit environment and purpose for which SV would place these components.

3. LEI was repairing and/or replacing failed components, but this was an ineffective causal factor solution (symptomatic). Consistent with my many years of experience and well-established industry best practices, the rate of failure experienced warranted the initiation of proven root cause analysis methods to determine all of the causal factors contributing to the continued failure of the LEI components. Without such analysis and resultant mitigations, I would expect the failure of the LEI components to continue at or above the then current rate of failure.

4. Such a failure rate of the LEI manufactured equipment was depriving the SV customers from the beneficial reliable use of the SV/LEI system for its intended purpose.

5. Due to LEI's failure to meaningfully collaborate with SV, as the customer, to conduct reasonable problem resolution techniques including root cause analysis, and to share those results with SV, SV remained solely accountable to its customers for a permanent solution to the ongoing issues of reliability.

6. SV sought and engaged alternative supply sources. SV implemented these alternatively sourced components at SV's cost to conform with customer obligations and expectations of system reliability.

---

[10] Sintron Technology, Corp  Master Supply & Purchasing Agreement – September 8, 2020
[11] Letter from Bruce Smith, President & CEO, Safety Vision to Geoffrey Egger, LEI Technology Canada – March 11, 2021





7. By not agreeing to meaningfully collaborate with SV and conducting the causal failure identification and subsequent root cause(s) analysis, LEI failed to fulfill the warranty provisions of the January 2016 contract between SV and LEI, and the warranty of merchantability and fitness of these components as set forth in this agreement for use in a mass transit vehicle.

## III.  OPINIONS

Based on my foregoing observations of the documents, my conclusions from the analysis of those observations and the evolution of this project it is my professional opinion that:

1. LEI failed to fulfill its obligations under the terms and conditions of the January 2016 contract with SV; and,
2. Failed to support SV in completing a collaborative analysis of the equipment provided by LEI to determine the causal factors of the component failures, the root cause of those failures and an action plan to eliminate those causal factors leading to the component failures.

## IV.  EXHIBITS

### Exhibit A –  Resume / Michael Hubbell

The following exhibits are referenced in this report and / or were reviewed in developing my conclusions and opinions.

### Exhibit B -  Documents Reviewed

List of documents received from SV and reviewed.

Respectfully Submitted,

_Michael C. Hubbell_                                  _September 30, 2022_

Michael C. Hubbell                                                        Date
Vice President, Client Services



## Exhibit A – Resume / Michael Hubbell

**Michael Hubbell**
**Vice President, Client Services**
**Lone Star Transit Asset Management, LLC**
**michael.hubbell@lonestar-tam.com**
**www.lonestar-tam.com**
**(214) 789-7799**



**Summary**
Providing asset management, inventory management, maintenance program and business process improvement consultation services, as well as, brokering other transportation management services to the North American transit industry.  After 40+ years in the mass transportation industry, I decided to alter my direction.  Having managed some of the most successful fully integrated multi-modal public transit maintenance programs, I now share my passion by helping others.  My approach is designed to empower the client's team and outfit them with the tools they need to succeed.

**Previous Experience**
**Vice President, Maintenance at Dallas Area Rapid Transit**
**January 1995 - January 2018**
Directed DART's second largest and most diverse department, employing ~995 skilled, non-skilled, professional, management and support team members.  Responsible for developing and overseeing both long and short-range maintenance programs and budgets.  Ensuring ~$5.4B of assets are maintained in a state of good repair including ~1,150 DART-operated buses, light rail & non-revenue vehicles; ~72.5M square feet of operating facilities, transit centers, passenger shelters and stops, and light rail stations; and ~212 track-miles of light rail right-of-way and systems.  Team is also responsible for providing technical training to maintenance employees including 19 different skill crafts, managing facility reconstruction and rehabilitation, and developing specifications for vehicles, services, components and consumable products.

**Major Accomplishments**
- Successfully developed programs and lead the team responsible for commissioning over 200 track miles of light rail right of way, 163 light rail cars and related operating facilities culminating in the longest light rail system currently in North America.
- Successfully developed and managed a long-range asset management program forecasting state of good repair requirements over a 20-year period for bus, light rail and facilities assets valued at more than $5B while allowing for financial capacity to support new capital construction over that same period.
- Developed and implemented program to transition entire bus fleet from diesel to natural gas fuel and constructed requisite infrastructure.  Program resulted in a return on the capital investment of ~$50M in less than 4 years.
- Developed and implemented a management succession program to prepare the organization for continuity of business and leadership to mitigate the risk of loss of knowledge due to ~32% of the maintenance management team reaching retirement eligibility over a 5-year period.
- Successfully developed and implemented technical training programs to enhance the knowledge, skills, and abilities of the 19 different skill crafts involved in maintenance of DART assets.

Lone Star Transit Asset
Management LLC



**Deputy Director, Maintenance at Santa Clara Valley Transportation Authority**
**February 1988 - December 1994**
Directed a team of SCVTA skilled, non-skilled, professional, management and support staff.  Responsible for maintenance of SCVTA assets including both bus and light rail vehicles, operating facilities, passenger shelters and stops, light rail systems, stations and right-of-way, and replacement parts inventory management.  Team was also responsible for providing technical training to maintenance employees, and developing specifications for vehicles, components and consumable products.

**Major Accomplishments**
- Successfully developed programs and lead the team responsible for commissioning the initial segments of the light rail system
- Successfully reorganized the maintenance responsibilities to transition the organization from a single mode system to a multi-modal system creating efficiencies in workflow and reduction in overhead costs.

**Manager, Maintenance at San Mateo County Transit District**
**July 1976 - February 1988**
Directed a team of samTrans skilled, non-skilled, professional, management and support staff.  Responsible for maintenance of samTrans assets including both bus and light automotive vehicles, operating facilities, and replacement parts inventory management.  Team was also responsible for providing technical training to maintenance employees, and developing specifications for vehicles, components and consumable products.

**Major Accomplishments**
- Successfully developed programs and lead the team responsible for commissioning of two new operating facilities
- Successfully developed and implemented technical training programs to enhance the knowledge, skills and abilities of technicians involved in maintenance of samTrans assets.

**Mechanic at West Valley Charter Lines Inc June 1973 - June 1976**

<u>**Professional Affiliations**</u>

Member – American Public Transportation Association (APTA)
-    Bus Technical Maintenance Committee
-    Workforce Development Committee
Member – South West Transit Association (SWTA)
Member – Texas Transit Association (TTA)
WBE Certification – North Central Texas Regional Certification Agency (NCTRCA)
SBE Certification – Texas Department of Transportation (TxDOT)



# Exhibit B – Reviewed Documents List

**List of documents received from SV and reviewed by Michael Hubbell**

| Ref # | Document Description | Document Reference / Date | Pages |
|---|---|---|---|
| 1 & 4 | ODM Agreement between LEI Technology Canada and Safety Vision | 01/12/2016 | 1-12 |
| 2 | Lanner Electronics Inc. Road Recorder 8000 Specifications | 03/02/2016 | 1-23 |
| 5 | Safety Vision Payment Detail Report w/attachment | 01/04/2017 | 1-3 |
| 6 | Email and attachments from Bruce Smith, Safety Vision to Geoffrey Egger | 09/19/2019 | 1-2 |
| 7 | Email exchanges between Richard Barrett, Safety Vision and Darren Khatib, Lanner | 10/2019 to 12/2019 | 1-13 |
| 9 | Email and attachments from Michael Ondruch, Safety Vision to Darren Khatib, Lanner | 05/18/2020 | 1-4 |
| 10 | Sintron Technology, Corp  Master Supply & Purchasing Agreement | 09/08/2020 | 1-35 |
| 11 | Letter from Bruce Smith, President & CEO, Safety Vision to Geoffrey Egger, LEI Technology Canada | 03/11/2021 | 1-2 |
|  | Plaintiff's (Safety Vision) Original Petition | 06/14/2021 | 1-7 |
|  | LEI Technology Canada's Initial Disclosure | 02/25/2022 | 1-5 |
|  | LEI Draft MOU w/Attachments | Unknown | Bates LEI000074 – LEI000090 |
|  | Plaintiff's (Safety Vision) Initial Disclosures Pursuant to Federal Rule of Civil Procedure 26 (a) (1) | 02/25/2022 | 1-5 |
|  |  |  |  |

Lone Star Transit Asset Management LLC

# Exhibit

# D

IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| SAFETY VISION, LLC | § | |
| *Plaintiff,* | § | |
| | § | |
| v. | § | CIVIL ACTION NO. 4:21-cv-03306 |
| | § | |
| LEI TECHNOLOGY CANADA AND | § | |
| LANNER ELECTRONICS, INC. | § | |
| *Defendants.* | § | |

## <u>DECLARATION OF TERENCE CHOU, GM OF LEI TECHNOLOGY CANADA</u>

I, Terence Chou, declare:

1. I am the General Manager of LEI Technology Canada, Defendant/Counter Plaintiff in the above-entitled action, and make this affidavit in support of LEI Technology Canada's Motion for Summary Judgment.

2. The following facts are relevant to the issues involved in the above-entitled action:

   a. On December 2, 2020, LEI shipped product to Safety Vision under purchase Order 1208698. The total amount owed by Safety Vision on the invoice for the December 2, 2020 shipment under Purchase Order 1208698 is $232,953.10. Safety Vision did not reject any of the product delivered under Purchase Order 1208698. Safety Vision has not remitted payment for the December 2, 2020, shipment under Purchase Order 1208698.

   b. On December 22, 2020, LEI shipped product to Safety Vision under Purchase Order 1208698. The total amount owed by Safety Vision on the invoice for the December 22, 2020, shipment under Purchase Order 1208698 is $5,373. Safety Vision did not reject any of the product delivered under Purchase Order 1208698. Safety Vision has not remitted payment for the December 22, 2020, shipment under Purchase Order 1208698.

   c. On January 5, 2021, LEI shipped product to Safety Vision under Purchase Order 1208698. The total amount owed by Safety Vision on the invoice for the January 5, 2021, shipment under Purchase Order 1208698 is $4,651.60. Safety Vision did not reject any

of the product delivered under Purchase Order 1208698.  Safety Vision has not remitted payment for the January 5, 2021, shipment under Purchase Order 1208698.

d.  On January 12, 2021, LEI shipped product to Safety Vision under Purchase Order 1209677.  The total amount owed by Safety Vision on the invoice for the January 12, 2021, shipment under Purchase Order 1209677 is $1,950.  Safety Vision did not reject any of the product delivered under Purchase Order 1209677.  Safety Vision has not remitted payment for the January 12, 2021, shipment under Purchase Order 1209677.

3.  The above facts are known by me to be true, of my own knowledge.  I am competent to testify to such facts, and would so testify if I appears in court as a witness at the trial of this matter.

4.  I declare under penalty of perjury that the foregoing is true and correct.

_____

Terence Chou,
GM, LEI Technology Canada

# Exhibit

# E



**LEI Technology Canada**
3160A Orlando Drive, Mississauga, I4V 1J2, On, Canada
E-mail: sales_ca@lannerinc.com      Web Site: www.lannerinc.com

Geoffrey Egger
General Manager
905 362 2364
geoffrey_egger@lannerinc.com

June 7th, 2021

VIA CERTIFIED MAIL, RETURN RECEIPT REQUESTED
AND VIA REGULAR MAIL
Safety Vision, LLC
6100 W. Sam Houston Parkway North
Houston, TX 77041-5113
Attn: Bruce Smith

> ***Re:    ODM Agreement between LEI Technology Canada and Safety Vision, LLC dated January 12, 2016 (the "Contract")***

Dear Mr. Smith,

I am writing in response to your demand letter of March 11, 2021.

As you are aware, LEI has spent considerable time and money attempting to help Safety Vision, LLC ("Safety Vision") find a solution for Safety Vision's product.  As you are also aware, the LEI parts purchased and used by Safety Vision are only one component in Safety Vision's overall product.  It is inaccurate to state that the video loss experienced by some of Safety Vision's customers is solely attributable to LEI's parts.  In fact, one of LEI's engineers tested the units in question during on-site visits in 2019 and discovered that the failures reported were due to circumstances outside of LEI's control, including but not limited to incoming power issues, weak or failed bus batteries and misconfigured external units.  Additionally, LEI examined a large number of "returned as defective" devices.  The results of the examination showed that the majority of the defective units were made defective by installer error.

Safety Vision has the right to reject non-conforming products within 30 days of receipt of the product.  If Safety Vision does not notify LEI within 10 days of expiration of the inspection period, the products are deemed accepted.  All products delivered by LEI to Safety Vision have been accepted per the terms of the Contract, and Safety Vision currently owes LEI $244,927.70 for outstanding invoices past due.

LEI does not believe it has breached any legal duties to Safety Vision and is amenable to cooperating with Safety Vision to resolve this potential dispute. Please give me a call if you would like to discuss this matter further.

Very truly yours,

Geoffrey Egger

LEI000088