United States District Court
Southern District of Texas
**ENTERED**
June 21, 2024
Nathan Ochsner, Clerk

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| **SAFETY VISION LLC,** | § | |
| | § | |
| **Plaintiff,** | § | |
| | § | |
| **VS.** | § | **CIVIL ACTION NO. 4:21-CV-03306** |
| | § | |
| **LEI TECHNOLOGY CANADA,** *et al.*, | § | |
| | § | |
| **Defendants.** | § | |

**<u>MEMORANDUM & ORDER</u>**

This case arises out of the sale of allegedly defective commercial video monitoring equipment. Before the Court is Defendant's Motion for Summary Judgment, ECF No. 55, and Defendant's Motion to Strike, ECF No. 76. The Motion for Summary Judgement is **GRANTED IN PART** and **DENIED IN PART.** The Motion to Strike is likewise **GRANTED IN PART** and **DENIED IN PART.**

**I.      BACKGROUND**

Plaintiff Safety Vision, LLC ("Safety Vision") is a supplier of commercial video surveillance equipment for use in mass transit. Defendant LEI Technology Canada ("LEI") and LEI's parent company, Lanner Electronics, Inc. ("Lanner"), manufacture and design hardware for use in mass transit.

This lawsuit arises from a 2016 contract—the ODM Agreement—between Safety Vision and LEI, in which LEI agreed to design and manufacture the products that became known as Road Recorder 8000 Network Video Recorder, power supply unit, and a removable hard drive tray

(collectively "RR8000") for Safety Vision. The RR8000 was customized to Safety Vision's specifications, and was designed to be resold to Safety Vision's customers.

The ODM Agreement included certain specifications for the RR8000s to meet. Among them was the requirement that the recorders "pass the test of ISO7637-2 level III Test Pulse 1, 2a, 2b, 3a, 3b, 4 with Criteria Min. Class C of functional status." ECF No. 57-2 at 11. ISO 7637-2 is a standard published by the International Standards Organization ("ISO"), and it classifies the functionality of devices like RR8000. The classification scale ranges from Class A to E depending on certain functionality features of the device. To meet the Class C requirements, the level mandated by the ODM Agreement, the unit must be able to automatically return to normal operation without further human intervention if an electrical exposure temporarily causes the device to stop performing. Hubbell Decl. ¶ 21.

Under the ODM Agreement, Safety Vision paid LEI $58,000 for engineering and design of the RR8000 units. Safety Vision subsequently ordered around 1,200 units over the following several years, which cost around $2.8 million. Of these, the first 200 had to be returned to LEI for repairs due to an issue that is not evident from the record.[1] *See* ECF No. 69-2.

Starting in 2017, Safety Vision's customers reported ongoing failures of the RR8000, including loss of video and corruption of video files. Hubbell Decl. ¶ 34. Additionally, they were unable to handle certain components of the RR8000s with bare hands due to excessive heat. *Id.* ¶ 42. Of the roughly 1200 units that Safety Vision resold to customers, about half were returned as

---

[1] In general, the record on summary judgment suffers from a lack of clarity. Although Safety Vision has submitted thousands of pages of documents, the exhibits follow a confusing numbering system, were submitted out of order, and are often not clearly marked. Moreover, many documents were submitted multiple times under different exhibit numbers, while others were split between multiple docket entries. Compounding the confusion, Safety Vision frequently cites to exhibits that are hundreds or thousands of pages long with no pincite to indicate what specific portion supports its claim. As a result, basic facts such as exactly how many units were purchased or how many units were returned remain elusive.

a result of these performance issues. ECF No. 12-1 ¶ 7. At some point after receiving several customer complaints and return requests, Safety Vision brought these issues to LEI's attention. The parties communicated throughout 2019 and 2020 to attempt to resolve this issue. ECF No. 69-2; Smith Decl. ¶ 9-12. In addition to the original 200 returned units, Safety Vision sent roughly 73 units to LEI to be repaired or replaced at some point between 2017 and 2019. ECF No. 69-2 at 16. Safety Vision also requested that LEI conduct an analysis of what was causing the continuous failures. Although it is unclear what the precise number is, Safety Vision has put forth evidence indicating that at least some of the units that were sent to LEI for analysis were never repaired, replaced, or returned to Safety Vision. Ondruch Decl. ¶ 7, 11; Smith Decl. ¶ 11; ECF No. 69-2 at 16.

During this time, LEI commissioned two tests to determine whether the RR8000 could meet ISO Class C standards. These tests yielded two ISO reports that were turned over to Safety Vision during discovery. The conclusions of these ISO reports were not communicated to Safety Vision at any point prior. Ondruch Decl. ¶ 24.

The first report was produced by the International Standards Laboratory in 2017 after testing the RR8000's ability to comply with ISO 7637 requirements. ECF No. 67-2 at 24-50; ECF No. 68-1 at 1-52. The report found that the RR8000s only achieved a minimum Class D functional status on several metrics, which is below the Class C status required by the ODM Agreement. ECF No. 68-1 at 5.

In late 2019, Lanner, LEI's parent company, commissioned SGS Compliance Certification Services, Inc. ("SGS") to conduct additional ISO testing, which assessed the RR8000's classification under ISO 16750-2. ISO 16750-2 is an updated version of ISO 7637-2. Like ISO 7637-2, ISO 16750-2 classifies devices like the RR8000 on a scale ranging from Class A to Class

E. The ISO 16750-2 standard is identical to the ISO 7637-2 in defining the characteristics of Class A to Class E. Hubbell Decl. ¶ 27. In December 2019, SGS reported via email to Lanner that the RR8000 failed to pass ISO 16750-2 with a minimal Class C functional status. On January 3, 2020, Lanner asked SGS to rerun the ISO 16750-2 test using a newer version of the RR8000. SGS complied. ECF No. 68-1 at 67-90. In February 2020, SGS issued a report of the results, which again indicated that the RR8000 could only achieve a Class D status. ECF No. 60-1 at 24. Internal emails at LEI and Lanner indicate that they believed the RR8000 could not meet the Class C requirements unless it was redesigned. ECF No. 57-10 at 5-6 ("RR8000 can't pass ISO16750-2 unless we change design.").

In 2021, Safety Vision brought the present action against LEI related to the alleged defects in the RR8000 devices. Now before the Court are LEI's Motion for Summary Judgment and Motion to Strike.

## II.     MOTION FOR SUMMARY JUDGMENT

### a.  Summary Judgment Standard

Summary judgment under Rule 56 "is proper 'if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.'" *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (quoting FED. R. CIV. P. 56(c)). A genuine issue as to a material fact arises "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The Court must draw all "reasonable inferences . . . in favor of the nonmoving party, but the nonmoving party 'cannot defeat summary judgment with conclusory allegations, unsubstantiated

assertions, or only a scintilla of evidence.'" *Hathaway v. Bazany*, 507 F.3d 312, 319 (5th Cir. 2007)

(quoting *Turner v. Baylor Richardson Medical Center*, 476 F.3d 337, 343 (5th Cir. 2007)).

"[T]he movant bears the initial responsibility of demonstrating the absence of a genuine

issue of material fact with respect to those issues on which the movant bears the burden of proof

at trial." *Transamerica Ins. Co. v. Avenell*, 66 F.3d 715, 718 (5th Cir. 1995). "For any matter on

which the non-movant would bear the burden of proof at trial, however, the movant may merely

point to the absence of evidence and thereby shift to the non-movant the burden of demonstrating

by competent summary judgment proof that there is an issue of material fact warranting trial." *Id.*

at 718-19.

### b. Exclusive Repair or Replace Remedy

The parties first dispute whether Safety Vision's recourse is limited to the exclusive repair

or replace remedy provided for in the ODM Agreement. The relevant portion of the ODM

Agreement states:

**11. WARRANTY**
*11.1 Hardware:*
11.1.1 LEI warrants the hardware portion of its Products to be free of defects in
workmanship and materials and to conform to the specifications contained
herein and to such other specifications as the parties agree to in writing, under
normal use and service, for 12 months from the date of delivery to Company.
11.1.2 If a Product does not operate as warranted during the applicable warranty
period, LEI shall, at its option and expense, (1) repair the defective product or
part, (2) deliver to customer an equivalent product or part to replace the
defective item. . . .
11.1.4 Procedures: Warranty service may be obtained by contacting a LEI office
within the applicable warranty period for a Return Material Authorization
(RMA) number. Once an RMA number is issued, the defective product must be
shipped back to LEI prepaid, insured and wrapped in the original and similar
shipping package to ensure that it will not be damaged during shipment. When
returning the defective product to LEI for service, the RMA number must be
marked on the outside of the shipping package. . . .
*11.2 Warranties exclusive:*
11.2.1 If the Product does not operate as warranted above, the customer's sole
remedy shall be, at LEI's option, repair or replacement. The foregoing

5

> warranties and remedies are exclusive and are in lieu of all other warranties, expressed or implied, either in fact or by operation of law, statutory or otherwise, including warranties of merchantability and fitness for a particular purpose. LEI neither assumes nor authorizes any other person to assure for it any other liability in connection with the sale, installation maintenance or use of LEI's Product.

ECF No. 55-1.

Parties to a sales agreement are permitted to contractually alter what damages are available "by limiting the buyer's remedies to return of the goods and repayment of the price or to repair and replacement of non-conforming goods or parts." Tex. Bus. & Com. Code § 2.719(a)(1). When such a remedy "is expressly agreed to be exclusive," then "it is the sole remedy." *Id.* § 2.719(a)(2). The parties do not dispute that the ODM Agreement contains an exclusive repair or replace remedy. However, Safety Vision contends that the exclusive remedy is inapplicable here because (1) the repair or replace remedy applies only to defects in materials, not design defects and (2) the remedy has failed of its essential purpose.

### i.   Defects in Materials Versus Defects in Design

Safety Vision asserts that the repair or replace remedy applies only to defects with the materials or workmanship of the product, not defects attributable to the RR8000's design. In parsing the application of a limited remedy contained in an express warranty, courts sometimes draw a distinction between defects in design and defects in workmanship or materials. *See, e.g.*, *Orthoflex, Inc. v. ThermoTek, Inc.*, No. 3:10-CV-2618-D, 2013 WL 4045206, at *8 (N.D. Tex. Aug. 9, 2013); *GT & MC, Inc. v. Texas City Ref., Inc.*, 822 S.W.2d 252, 256 (Tex. App. 1991); *Rice v. Sunbeam Prod., Inc.*, No. CV 12-7923-CAS-AJWX, 2013 WL 146270, at *12 (C.D. Cal. Jan. 7, 2013); *Bruce Martin Const., Inc. v. CTB, Inc.*, No. 1:10CV205 SNLJ, 2012 WL 6203112, at *2 (E.D. Mo. Dec. 12, 2012), *aff'd*, 735 F.3d 750 (8th Cir. 2013). The essential distinction drawn in these instances is that a defect in workmanship or materials exists when a product is not

assembled properly, whereas a design defect exists when a product is built in accordance with the design, but the design is unable to yield a product that meets certain agreed upon performance metrics.

*GT & MC* is particularly instructive here. In that case, the warranty provision stated, "Any **workmanship or material** that may prove defective within one year from the date of completion of erection, ordinary wear and tear excepted, will be repaired or replaced without expense to you." 822 S.W.2d at 256 (emphasis in original). The court there held that the provision "expressly limited [plaintiff's] recovery only for defects in *materials or workmanship* to damages for repair or replacement value. No mention was made in the guarantee of remedies for *design defects;* therefore, remedies for breach of the express warranty related to design requirements were neither limited nor disclaimed." *Id.* at 257 (emphasis in original).

The ODM Agreement contains similar language warrantying the "workmanship and materials" of the product. However, unlike in *GT & MC*, here the express warranty also guarantees that the product will "conform to the specifications contained herein and to such other specifications as the parties agree to in writing," and the related limited repair or replace remedy applies to any situation where the product "does not operate as warranted." ECF No. 55-1. Notably, the referenced specifications include requirements for the mechanical features of the RR8000 as well as requirements for the RR8000's performance. For example, they require that the "Power Module design need [sic] to pass the test of ISO7637-2 level III Test Pulse 1, 2a, 2b, 3a, 3b, 4 with Criteria Min. Class C of functional status." ECF No. 57-2 at 11. To meet Class C functional status, the unit must be able to automatically return to normal operation without further human intervention if an electrical exposure temporarily causes the device to stop performing. Because the specifications include certain performance criteria that the RR8000's design must meet, the

express warranty and its corollary limited repair or replace remedy apply to both defects in design and defects in workmanship and materials.

### ii.  Failure of Essential Purpose

Safety Vision next argues that the limited remedy provision does not apply because it has failed of its essential purpose. As noted above, parties are permitted to agree to a limited repair or replace remedy. *See* Tex. Bus. & Com. Code § 2.719(a)(1). However, "where circumstances cause an exclusive or limited remedy to fail of its essential purpose, remedy may be had as provided in this title." *Id.* § 2.719(b). A remedy fails of its essential purpose when it "operates to deprive either party of the substantial value of the bargain." *Id.* § 2.719 cmt. 1. More specifically, a repair or replace remedy "fails of its essential purpose when a warrantor fails to correct the defect within a reasonable time or after multiple attempts." *Orthoflex*, 2013 WL 4045206, at *7. Ultimately, "[t]he test in determining whether a limited warranty failed of its essential purpose is whether the buyer is given, within a reasonable time, goods that conform to the contract." *Delhomme Indus. v. Houston Beechcraft, Inc.*, 669 F.2d 1049, 1063 (5th Cir. 1982) (interpreting analogous provision of the Kansas UCC).

There is sufficient evidence for a reasonable jury to find that the ODM Agreement's repair or replace remedy failed of its essential purpose. Safety Vision attempted to coordinate with LEI for several years to have the pervasive issues with the RR8000s identified and resolved. There is evidence in the record that roughly half of the RR8000 units sold to Safety Vision experienced failures. ECF No. 12-1. Of the units that Safety Vision sent to LEI for repairs, it appears some number still have not been repaired or returned to Safety Vision. ECF No. 69-2 at 16. Further, two separate ISO tests indicated that the RR8000 model was unable to meet the ISO Class C requirements set out in the ODM Agreement's specifications, suggesting that any repair of

defective parts or replacement with an identical RR8000 unit would be unable to bring the product into conformance with the specifications. Insofar as there is a dispute over whether the repairs were effectively completed, and whether it was even possible for repairs to resolve the prevalent performance issues, it is unclear whether the remedy failed of its essential purpose. *See Agristor Credit Corp. v. Schmidlin*, 601 F. Supp. 1307, 1315 (D. Or. 1985) (interpreting analogous UCC provision and finding evidence that "effective repairs were not performed, or were impossible to perform" would support a claim that "the exclusive remedy under the contract failed.").

LEI argues that because Safety Vision only returned a portion of the units to LEI for repair, Safety Vision cannot show that the repair or replace remedy failed of its essential purpose with respect to all the units. However, LEI identifies no authority mandating that repairs be attempted and proven ineffective on all units of an identical product in order for a repair or replace remedy to fail. For example, in *Orthoflex*, the Court found that although the buyer had not returned every unit under the warranty, there was still a genuine dispute as to whether the exclusive remedy had failed in light of the fact that numerous units were returned, and many were taken out of service due to performance issues. 2013 WL 4045206, at *7. The court concluded, "a reasonable jury could also find that plaintiffs simply decommissioned some units rather than return them to [the seller], thereby making it appear (inaccurately) that the repair or replacement remedy was satisfactory." *Id.* at *7 n.13.

LEI relies primarily on *New Braunfels Indep. Sch. Dist. v. FieldTurf USA Inc.*, No. 07-20-00308-CV, 2021 WL 5277135 (Tex. App. Nov. 12, 2021). In that case, the court found there was insufficient evidence that the repair remedy failed because the buyer "candidly admits it did not prove that the exclusive or limited remedy failed of its essential purpose because its position was it was not required to do so." *Id.* at *6. In reaching this outcome, the court noted that the buyer

"presented no evidence that it had requested repair or replacement of the field or that FieldTurf had refused such requests." *Id.* Contrary to LEI's argument, the Court does not read this to mean there must be a showing in every case that a buyer requested repairs of all units that were failing, but rather that that is one way of showing that a repair or replace remedy failed. Moreover, unlike in *New Braunfels*, Safety Vision did seek repairs of some of the RR8000s, and there is a genuine dispute as to whether those repairs were completed and effective. In sum, the Court finds that there is a genuine dispute as to whether the repair or replace remedy failed of its essential purpose.

### c. Consequential Damages Waiver

Next the parties dispute whether Safety Vision is barred from recovering consequential damages under the ODM Agreement. The ODM Agreement states,

> In no event will either party's liability of any kind arising out of this Agreement, regardless of the form in which any legal or equitable action may be brought, include any costs of procuring substitute goods or services or any special, incidental, indirect or consequential damages, however caused, even if such party has knowledge of this possibility of the potential loss or damage and notwithstanding any failure of essential purpose of any limited remedy.

ECF No. 55-1. "Consequential damages may be limited or excluded unless the limitation or exclusion is unconscionable." Tex. Bus. & Com. Code § 2.719(c). Accordingly, the *sole* way to avoid enforcement of an agreement to limit or exclude consequential damages is to show that the waiver was unconscionable. *Id.*; *Bray Int'l, Inc. v. Computer Assocs. Int'l, Inc.*, No. CIV H-02-0098, 2005 WL 3371875, at *4 (S.D. Tex. Dec. 12, 2005) ("The Texas UCC could not be clearer that the only exception to the enforcement of [a consequential damages waiver] comes into play if the clause or contract is unconscionable.").

The parties do not dispute that the ODM Agreement contains a consequential damages waiver. Rather, Safety Vision contends that the waiver is unconscionable. "To determine whether a contract is unconscionable a court must look to the circumstances surrounding the agreement,

the alternatives, if any, which were available to the parties at the time of making the contract, the

nonbargaining ability of one party, and whether the contract is illegal or against public policy."

*Lindemann v. Eli Lilly & Co.*, 816 F.2d 199, 203 (5th Cir. 1987). "Generally, contracts are rendered

unconscionable by procedural abuse arising in contract formation, such as the inability of one party

to bargain; and by abuse concerning substantive contract terms, such as whether printed terms of

a form contract are so one-sided as to be unreasonable." *Id.* Notably, "the principle of

unconscionability is one of preventing oppression and unfair surprise, *not* the disturbance of

allocation of risks because of superior bargaining power." *Id.* at 204.

There is no evidence in the record to suggest unconscionability. First, this is a contract for

a custom designed commercial product where both parties are sophisticated business entities. This

is not the sort of "contract for consumer goods entered into by a naive and credulous member of

the public" that tends to lead to unconscionable terms. *Eastman Chem. Co. v. Niro, Inc.*, 80 F.

Supp. 2d 712, 719 (S.D. Tex. 2000). Moreover, Safety Vision does not identify any facts about the

bargaining process that would suggest it had an inability to negotiate the terms of the waiver.

Nor is the substance of the waiver itself unconscionable. Texas law explicitly blesses the

existence of consequential damages waivers. *See* Tex. Bus. & Com. Code § 2.719. Further, as

explained by the Court in *Eastman*, such waivers are common between commercial parties:

> It often makes much commercial sense for parties to agree that the buyer will
> shoulder the risk of consequential losses. The seller may not be in a position to
> evaluate the extent or likelihood of consequential damages, since these risks are
> largely determined by the buyer's unique business circumstances. Likewise, a buyer
> may rationally agree to assume the risk of consequential losses rather than pay a
> higher price for the goods, a price which would necessarily include what amounts
> to an insurance premium for the seller's assumption of the risk of consequential
> losses.

80 F. Supp. 2d at 721. Ultimately, there is nothing in the substance of the ODM Agreement's consequential damages waiver to suggest it is unconscionable—to the contrary, it appears to be exactly the sort of risk allocation provision that is common in commercial contracts.

Safety Vision argues that, in combination with the repair or replace provision, the consequential damages waiver is unconscionable. However, "the viability of a provision limiting liability for consequential damages is not dependent on the success of the remedy in the limited warranty clause." *Bray Int'l, Inc. v. Computer Assocs. Int'l, Inc.*, No. CIV H-02-0098, 2005 WL 3371875, at *3 (S.D. Tex. Dec. 12, 2005); *Orthoflex*, 2013 WL 4045206, at *7 (same); *Eastman Chem. Co. v. Niro, Inc.,* 80 F. Supp. 2d 712, 721 (S.D. Tex. 2000) ("[A] majority of jurisdictions to consider the question ha[ve] concluded that a waiver of consequential damages can be valid notwithstanding the fact that a limitation of remedy has failed of its essential purpose."). Thus, the Court finds that the consequential damages waiver in the ODM Agreement is not unconscionable and must be enforced.[2]

### d. Deceptive Trade Practices Act

Safety Vision brings a claim under the Deceptive Trade Practices Act ("DTPA") alleging that LEI made misrepresentations about the functioning of the RR8000 units. The DTPA is a consumer protection statute and excludes high value transactions between businesses. Specifically, it bars a claim "arising from a transaction, a project, or a set of transactions relating to the same project, involving total consideration by the consumer of more than $500,000." Tex. Bus. & Com. Code § 17.49(g). The purpose of this exception is to "remove from the scope of the [DTPA] . . .

---

[2] The parties also dispute whether a plaintiff may assert raise an unconscionability argument on summary judgment if it failed to plead unconscionability. The Court need not reach this issue, as there is no evidence to support a finding of unconscionability.

litigation between big businesses." *Citizens Nat'l Bank v. Allen Rae Invs., Inc.*, 142 S.W.3d 459, 473 (Tex. App. 2004) (citation omitted).

In a series of purchases orders made pursuant to the ODM Agreement's terms, Safety Vision paid LEI around $2.8 million for the RR8000s. Although Safety Vision admits that the cumulative amount paid in this series of purchases exceeds the $500,000 threshold, Safety Vision argues that the exception is inapplicable because the ODM Agreement itself did not obligate Safety Vision to pay over $500,000 or purchase any minimum quantity of units.

Safety Vision's argument is unpersuasive. First, "the manufacturing and distribution relationship between the two parties constitutes a 'project' within the meaning of section 17.49(g)." *Glob. Int'l, LLC v. ProBalance, Inc.*, No. 3:15-CV-0677-N, 2016 WL 6646225, at *5 (N.D. Tex. Nov. 9, 2016). In assessing the value of a project, it is proper to look at the "set of transactions" between the parties. *Id.*; *Mullins Square, Inc. v. Source 2 Mkt., LLC*, No. A-08-CA-777-SS, 2009 WL 10669887, at *4 (W.D. Tex. Dec. 14, 2009) (assessing value of project by looking to the "series of purchase orders" between the parties). All of the purchases at issue were between the same two parties (Safety Vision and LEI), were for the same product (RR8000 units), and were formed under the terms of same predicate agreement (the ODM Agreement). Therefore, in determining the amount of consideration for the purposes of the DTPA exception, it is proper to look at the entire series of RR8000 purchases collectively.

With respect to Safety Vision's contention that the ODM Agreement did obligate Safety Vision to purchase any minimum quantity of units, DTPA's exception for large sales does not require the sale be contractually guaranteed. In instances where a contract only specified a per unit price but did not mandate a minimum number of units be purchased, courts have applied the § 17.49(g) exception where the amount actually purchased exceeds the $500,000 threshold. *See, e.g.*,

13

*E. Hill Marine, Inc. v. Rinker Boat Co.*, 229 S.W.3d 813, 821 (Tex. App. 2007) (applying exception where "within months after . . . its initial agreement" the buyer agreed to pay over $500,000 for units of the product); *see also Mullins Square, Inc. v. Source 2 Mkt., LLC*, No. A-08-CA-777-SS, 2009 WL 10669887, at *4 (W.D. Tex. Dec. 14, 2009) (applying exception where there was no written agreement but the series of transactions between parties totaled over $500,000). Thus, the Court is not limited to examining what quantity was agreed to (or not agreed to) in the initial ODM Agreement. Because Safety Vision's consideration in the series of RR8000 sales surpassed the $500,000 statutory threshold, the DTPA exception for large sales codified in § 17.49(g) squarely applies to this case. Summary judgment is **GRANTED** for LEI on Safety Vision's DTPA claim.

LEI asserts that it is entitled to costs and attorneys' fees. If it is found that a DTPA claim "was groundless in fact or law," then "the court shall award to the defendant reasonable and necessary attorneys' fees and court costs." Tex. Bus. & Com. Code § 17.50(c). In this context, "groundless" means the claim lacked an arguable basis in fact or law and was not supported by a good faith argument for the extension, modification, or reversal of existing law. *Cypress Engine Accessories, LLC v. HDMS Ltd. Co.*, 283 F. Supp. 3d 580, 592 (S.D. Tex. 2017). Although the Court finds in LEI's favor on the DTPA claim, Safety Vision's argument was not so meritless that it lacked an arguable basis in law. The request for costs and attorneys' fees is **DENIED**.

### e. Fraudulent Concealment

Safety Vision alleges that LEI fraudulently failed to disclose that the RR8000 could not comply with the performance metrics in the ODM Agreement's specifications. In particular, Safety Vision notes that LEI knew from the ISO tests that the RR8000 design could not meet ISO Class C requirements yet failed to disclose this fact. LEI responds that a claim for fraudulent concealment is barred by the economic loss rule.

14

"The acts of a party may breach duties in tort or contract alone or simultaneously in both." *Jim Walter Homes, Inc. v. Reed*, 711 S.W.2d 617, 618 (Tex. 1986). The economic loss rule holds that "[w]hen the injury is only the economic loss to the subject of a contract itself, the action sounds in contract alone." *Id.* To determine whether the economic loss rule bars a particular tort claim, the Court must conduct "an analysis of [the rule's] rationales in a particular situation." *LAN/STV v. Martin K. Eby Const. Co.*, 435 S.W.3d 234, 246 (Tex. 2014). As the Texas Supreme Court has explained,

> If the defendant's conduct—such as negligently burning down a house—would give rise to liability independent of the fact that a contract exists between the parties, the plaintiff's claim may also sound in tort. Conversely, if the defendant's conduct—such as failing to publish an advertisement—would give rise to liability only because it breaches the parties' agreement, the plaintiff's claim ordinarily sounds only in contract.

*Sw. Bell Tel. Co. v. DeLanney*, 809 S.W.2d 493, 494 (Tex. 1991). Stated differently, the Court must consider "the source of the defendant's duty to act (whether it arose solely out of the contract or from some common-law duty) and the nature of the remedy sought by the plaintiff." *Ibe v. Jones*, 836 F.3d 516, 526 (5th Cir. 2016) (quoting *Crawford v. Ace Sign, Inc.*, 917 S.W.2d 12, 13 (Tex. 1996)); *Stanley Indus. of S. Fla. v. J.C. Penney Corp., Inc.*, No. 3:05-CV-2499-L, 2006 WL 2432309, at *5 (N.D. Tex. Aug. 18, 2006) ("In determining whether a tort claim is merely a repackaged breach of contract claim, a court must consider: 1) whether the claim is for breach of duty created by contract, as opposed to a duty imposed by law; and 2) whether the injury is only the economic loss to the subject of the contract itself.").

The Texas Supreme Court has found that fraudulent inducement claims generally are not barred by the economic loss rule because "the legal duty not to fraudulently procure a contract is separate and independent from the duties established by the contract itself." *Formosa Plastics Corp. USA v. Presidio Engineers & Contractors, Inc.*, 960 S.W.2d 41, 46 (Tex. 1998). As for fraud

15

*after* the formation of a contract, which is what Safety Vision alleges, there is no categorical rule as to whether the economic loss rule applies. Instead, the Court must look to (1) the source of the duty and (2) the damages sought.[3] *See Ibe*, 836 F.3d at 526.

As a general rule, "failure to disclose information does not constitute fraud unless there is a duty to disclose the information." *Vanderbilt Mortg. and Finance, Inc. v. Flores*, 735 F. Supp. 2d 679, 695 (S.D. Tex. 2010). A duty to disclose "arises only when there is a fiduciary or confidential relationship between the parties." *Id.* Safety Vision has identified no basis for such a fiduciary or confidential relationship apart from the parties' contractual relationship.

Further, Safety Vision's damages resulting from the non-disclosure include purely economic losses related to the subject of the contract: loss of the benefit of the products bargained for, diminished value of the products, and costs and expenses to inspect and replace the products. ECF No. 42 ¶¶ 91-92. In its Response to the Motion for Summary Judgment, Safety Vision argues that it suffered reputational damages, which are not precluded by the economic loss rule. *See FinishMaster, Inc. v. Richard's Paint & Body Shop, LLC*, No. A-11-CA-560 AWA, 2012 WL 2376218, at *3 (W.D. Tex. June 22, 2012). However, Safety Vision failed to plead any damages related to reputational harm. ECF No. 42 ¶¶ 91-92. Because this theory is raised for the first time in its Response, it is not properly before the Court. *See Cutrera v. Bd. of Supervisors*, 429 F.3d 108, 113 (5th Cir. 2005).

---

[3] Safety Vision asks the Court to find that the economic loss rule categorically does not apply to intentional torts. To be sure, a small minority of cases have held that the economic loss rule does not apply in *any* intentional tort case. *See, e.g.*, *Fuller v. Le Brun*, 616 S.W.3d 31, 45 (Tex. App. 2020). However, such a broad holding would run contrary to the Fifth Circuit's application of the economic loss rule to preclude intentional tort claims such as fraudulent concealment. *See Ibe v. Jones*, 836 F.3d 516, 526 (5th Cir. 2016); *see also Peterson Grp., Inc. v. PLTQ Lotus Grp., L.P.*, 417 S.W.3d 46, 63 (Tex. App. 2013); *Fitzgerald v. Chase Home Loans*, No. 4:11-CV-01156, 2012 WL 13047728, at *3 (S.D. Tex. Aug. 16, 2012); *ADP, LLC v. Uniloc Luxembourg S.A.*, No. 5:19-CV-00015-RWS, 2020 WL 3163035, at *7 (E.D. Tex. Apr. 1, 2020); *Sharp Mexican Partners, LP v. Republic Waste Servs. of Texas, Ltd.*, No. 3:17-CV-1605-S, 2018 WL 4053365, at *4 (N.D. Tex. Aug. 24, 2018).

In sum, because Safety Vision's fraudulent concealment claim arises out of its contractual relationship with LEI and asserts no non-economic injury, it is barred by the economic loss rule. *See Ibe*, 836 F.3d at 526 (finding fraudulent concealment claim barred by the economic loss rule where the plaintiff identified no independent basis for the duty to disclose and alleged no damages independent from those resulting from the breach of contract); *Fitzgerald v. Chase Home Loans*, No. 4:11-CV-01156, 2012 WL 13047728, at *3 (S.D. Tex. Aug. 16, 2012) (same); *Boswell v. Pappy's Pet Lodge Grp., LLC*, No. 05-23-00040-CV, 2024 WL 396621, at *6 (Tex. App. Feb. 2, 2024) (same); *ADP, LLC v. Uniloc Luxembourg S.A.*, No. 5:19-CV-00015-RWS, 2020 WL 3163035, at *7 (E.D. Tex. Apr. 1, 2020) (same); *Sharp Mexican Partners, LP v. Republic Waste Servs. of Texas, Ltd.*, No. 3:17-CV-1605-S, 2018 WL 4053365, at *4 (N.D. Tex. Aug. 24, 2018) (same). Accordingly, LEI's Motion for Summary Judgment is **GRANTED** with respect to this claim.

### f.  Breach of Implied Warranty of Fitness for a Particular Purpose

### i.  Implied Warranty Waiver

Saftey Vision asserts that LEI breach its implied warranty of fitness for a particular purpose.[4] LEI argues that Safety Vision's implied warranty claim is waived because the ODM Agreement included an implied warranty waiver. "[T]o exclude or modify any implied warranty of fitness the exclusion must be by a writing and conspicuous." Tex. Bus. & Com. Code § 2.316(b). "A term or clause is conspicuous when it is so written that a reasonable person against whom it is to operate ought to have noticed it." *Yumilicious Franchise, L.L.C. v. Barrie*, 819 F.3d 170, 179 (5th Cir. 2016); Tex. Bus. & Com. Code § 1.201(b)(10). "Conspicuous terms include the

---

[4] Safety Vision clarifies in its Response that it is only pressing a claim for implied warranty of fitness, not a claim for implied warranty of merchantability. ECF No. 56 at 18-19 ("[T]he warranty of fitness . . . is the warranty being sued upon in the First Amended Complaint.").

following: (A) a heading in capitals equal to or greater in size than the surrounding text, or in contrasting type, font, or color to the surrounding text of the same or lesser size; and (B) language in the body of a record or display in larger type than the surrounding text, or in contrasting type, font, or color to the surrounding text of the same size, or set off from surrounding text of the same size by symbols or other marks that call attention to the language." Tex. Bus. & Com. Code § 1.201(b)(10). "Whether a term is 'conspicuous' or not is a decision for the court." Tex. Bus. & Com. Code § 1.201(b)(10). Notably, this is an objective test that is not dependent on the sophistication of the parties. *See Cate v. Dover Corp.*, 790 S.W.2d 559, 560 (Tex. 1990) (rejecting argument that "a lesser standard of conspicuousness should apply to a disclaimer made to a merchant").

The ODM Agreement contained the following warranty disclaimer:

**11. WARRANTY**

. . .

*11.2 Warranties exclusive:*

11.2.1 If the Product does not operate as warranted above, the customer's sole remedy shall be, at LEI's option, repair or replacement. The foregoing warranties and remedies are exclusive and are in lieu of all other warranties, expressed or implied, either in fact or by operation of law, statutory or otherwise, including warranties of merchantability and fitness for a particular purpose. LEI neither assumes nor authorizes any other person to assure for it any other liability in connection with the sale, installation maintenance or use of LEI's Product.

ECF No. 55-1. The Court finds that this waiver is not conspicuous. First, it is buried at the bottom of the fourth page of the eight-page contract. Second, the text of the waiver is itself indistinguishable from the surrounding text. The type face is the same size as the surrounding text, and it is not written in capital letters, bold font, or otherwise set off from the rest of the text. The "Warranties exclusive" subheading, while written in bold and italicized, is identical to the dozens of other subheadings in the contact, which are written in a similar style. And, the subheading is far

less conspicuous than the contract's 17 full headings, each of which are (1) presented in bold capital letters, (2) set apart from the rest of the agreement by their level of indentation, and (3) distinguished by the empty lines left before and after them. Meanwhile, the warranties exclusive subheading is of the same alignment as the general text and is enclosed by single-space text. A "conspicuous clause must have a heading that sets it off from other headings in the document and the clause must be set off from the rest of the text in the document." *Honey Holdings I, Ltd. v. Alfred L. Wolff, Inc.*, 81 F. Supp. 3d 543, 560 (S.D. Tex. 2015). Here, there is nothing distinguishable about the text, nor is the heading prominent compared to other headings in the ODM Agreement.

Next LEI argues that the waiver is enforceable because Safety Vision had actual knowledge of the warranty provision. An inconspicuous warranty disclaimer can be enforced if the buyer had actual knowledge of the disclaimer. *Cate v. Dover Corp.*, 790 S.W.2d 559, 561 (Tex. 1990). "This knowledge can result from the buyer's prior dealings with the seller, or by the seller specifically bringing the inconspicuous waiver to the buyer's attention." *Id.* "The seller has the burden of proving the buyer's actual knowledge of the disclaimer." *Id.* at 562.

The only evidence LEI identifies to support its contention that Safety Vision had actual knowledge of the warranty provision is the fact that Safety Vision's CFO testified that he signed the ODM Agreement. Ondruch Dep. 13:11–16. LEI presents no evidence that Safety Vision would have known about the disclaimer from prior dealings with LEI or that LEI brought the disclaimer to Safety Vision's attention. Further, LEI identifies no authority suggesting that a signature is by itself adequate proof of actual knowledge. To the contrary, if a party's signature on an agreement were sufficient to prove actual knowledge of a disclaimer, the actual knowledge exception to conspicuousness would swallow the rule. That is, parties could circumvent the conspicuousness

requirement in every case involving a signed agreement, effectively rendering it null. In sum, the Court finds that the implied warranty waiver does not preclude Safety Vision's implied warranty claim on summary judgment because the waiver was not conspicuous, and LEI has not shown that Safety Vision had actual knowledge of it.

### ii.   Displacement of Implied Warranties by Specifications

LEI next argues that the contract's specifications displace any implied warranties. "The situation in which the buyer gives precise and complete specifications to the seller . . . is a frequent circumstance by which the implied warranties may be excluded." Tex. Bus. & Com. Code § 2.316 cmt. 9. That is, implied warranties may be displaced "where [the buyer], a sophisticated purchaser, has provided detailed specifications for [the seller] to implement." *Baker Hughes Process & Pipeline Servs., L.L.C. v. UE Compression, L.L.C.*, 938 F.3d 661, 670 (5th Cir. 2019).

However, the language of Comment 9 and *Baker Hughes* make clear that this rule does not apply in every case involving detailed contractual specifications. Rather, it is reserved for situations where the *buyer* provides detailed specifications. Central to the court's finding in *Baker Hughes* was the fact that the buyer clearly provided the specifications for the design, which was evidenced by contractual provisions confirming "[the buyer's] ultimate responsibility for the design, its duty to supply technical information, its ability to modify specs during the fabrication, and its right to approve any drawings or specifications prepared by [the seller]." *Baker Hughes*, 938 F.3d at 670.

Here LEI has proffered no evidence that Safety Vision provided the specifications or was responsible for the design of the RR8000. To the contrary, Safety Vision in fact paid LEI $58,000 under the ODM Agreement to design the RR8000. Thus, the Court cannot find that this exception

applies as a matter of law. The Motion for Summary Judgment is **DENIED** on the implied warranty of fitness for a particular purpose claim.

### g.  Breach of Contract

Safety Vision brings a breach of contract claim asserting that the RR8000s did not conform to the contract's specifications. LEI argues (1) Safety Vision accepted the goods and cannot show it rescinded acceptance, (2) Safety Vision has presented insufficient evidence of causation, and (3) Safety Vision cannot recover any damages related the units which its customers have not sought to return.

#### i.  Acceptance and Revocation

"[D]amages are only permitted under a breach of contract cause of action when the seller has failed to deliver the goods, the buyer has rejected the goods, or the buyer has revoked his acceptance." *Luig v. N. Bay Enterprises, Inc.*, 817 F.3d 901, 906 (5th Cir. 2016) (quoting *A.O. Smith Corp. v. Elbi S.P.A.*, 123 F. App'x 617, 619 (5th Cir. 2005)). If a buyer accepted the goods and did not revoke that acceptance, then it has only a breach of warranties claim for defects that are later found. *Id.*

There is no genuine dispute that Safety Vision did not accept the goods. "Acceptance of goods occurs when the buyer . . . does any act inconsistent with the seller's ownership." Tex. Bus. & Com. Code § 2.606(a). A buyer's subsequent sale of the goods to a third-party customer is inconsistent with the original seller's ownership. *See, e.g.*, *Impact Finishing, Inc. v. Wild Card, Inc.*, No. 3:22-CV-0290-B, 2024 WL 331618, at *7 (N.D. Tex. Jan. 29, 2024); *SB Int'l, Inc. v. Mike Jordan Co., Inc.*, No. 3:08-CV-1091-P, 2009 WL 10704364, at *2 (N.D. Tex. June 3, 2009); *Eilenberger's, Inc. v. Westpoint Home, LLC*, No. 04-21-00392-CV, 2023 WL 242727, at *3 (Tex.

App. Jan. 18, 2023). The fact that Safety Vision resold the RR8000s to its customers is inconsistent with LEI's ownership and is sufficient to establish acceptance.

However, Safety Vision argues that even if it did initially accept the RR8000s, it later revoked its acceptance. "The buyer may revoke his acceptance of a lot or commercial unit whose non-conformity substantially impairs its value to him if he has accepted it (1) on the reasonable assumption that its non-conformity would be cured and it has not been seasonably cured; or (2) without discovery of such non-conformity if his acceptance was reasonably induced either by the difficulty of discovery before acceptance or by the seller's assurances." Tex. Bus. & Com. Code § 2.608(a). "Revocation of acceptance must occur within a reasonable time after the buyer discovers or should have discovered the ground for it and before any substantial change in condition of the goods which is not caused by their own defects. It is not effective until the buyer notifies the seller of it." *Id.* § 2.608(b). "Notice of rejection must be clear and unambiguous, 'mere notice that goods are nonconforming is not sufficient notice of rejection or revocation of acceptance.'" *Luig v. N. Bay Enterprises, Inc.*, No. 7:13-CV-00094-O, 2016 WL 11671168, at *4 (N.D. Tex. Nov. 9, 2016) (quoting *Courey Int'l v. Designer Floors of Texas, Inc.*, No. 03-09-00059-CV, 2010 WL 143420, at *6 (Tex. App. Jan. 15, 2010)). "Whether a buyer has complied with the requirements of § 2.608 in giving adequate notice of revocation of acceptance is a question for the trier of fact." *Structural Metals, Inc. v. S & C Elec. Co.*, No. SA-09-CV-984-XR, 2012 WL 5208543, at *8 (W.D. Tex. Oct. 22, 2012).

LEI contends that Safety Vision has not satisfied its burden of showing it provided timely and unambiguous notice of revocation to LEI. However, on this issue, the Court finds there's a genuine dispute of material fact. In a letter dated February 6, 2024, and titled "FORMAL WRITTEN NOTICE OF REJECTION AND/OR NOTICE OF REVOCATION," counsel for

Safety Vision informed counsel for LEI that, "[t]o the extent not otherwise previously presented," Safety Vision was revoking acceptance of the RR8000s due to their alleged non-conformity with the ODM Agreement. ECF No. 57-11 at 48. To be sure, there is certainly a question of whether this notice or revocation was timely and whether prior notices of non-conformity satisfy the "clear and ambiguous" requirement. However, because LEI makes no argument that this revocation fails as a matter of law, the Court finds summary judgment inappropriate at this juncture.

### ii. Evidence of Causation

Next LEI argues that Safety Vision does not have sufficient expert testimony to prove causation. "The elements in a claim for breach of contract are: (1) a valid contract; (2) the plaintiff performed or tendered performance; (3) the defendant breached the contract; and (4) the plaintiff was damaged as a result of the breach." *Richter v. Wagner Oil Co.*, 90 S.W.3d 890, 898 (Tex. App. 2002). "[A] party may not recover damages for breach of contract if those damages are remote, contingent, speculative, or conjectural." *S. Elec. Servs., Inc. v. City of Houston*, 355 S.W.3d 319, 324 (Tex. App. 2011). "Thus, the absence of a causal connection between the alleged breach and the damages sought will preclude recovery." *Id.*

LEI asserts that Safety Vision has not proffered sufficient evidence proving that the issues Safety Vision's customers experienced were caused by product defects, as opposed to, for example, some environmental cause. However, it is not clear that such a showing is required for LEI to recover direct damages under their breach of contract claim. As explained above, the ODM Agreement's prevents Safety Vision from recovering consequential damages. However, Safety Vision also pleads direct damages such as the "diminished value of the Products." ECF No. 42 ¶ 92; *see also DaimlerChrysler Motors Co., LLC v. Manuel*, 362 S.W.3d 160, 180 (Tex. App. 2012) ("One measure of direct damages is the 'benefit of the bargain' measure, which utilizes an

expectancy theory and evaluates the difference between the value as represented and the value received."). Direct damages "are those inherent in the nature of the breach" and are a "necessary consequence of the defendant's [breach]." *Manuel*, 362 S.W.3d at 179. To the extent Safety Vision is able to show that there was a breach—for example, that the RR8000s did not conform to contract's specifications[5]—it is not clear that Safety Vision needs expert testimony to establish that this breach caused direct damages related to the diminished value of the product. The authorities LEI relies on are distinguishable insofar as they either consider what causation evidence is needed to prove non-contract claims or they discuss causation in the context of proving consequential damages, which are inherently more causally attenuated than direct damages. *See Romo v. Ford Motor Co.*, 798 F. Supp. 2d 798 (S.D. Tex. 2011); *Lucero v. Gen. Motors LLC*, No. 4:21-CV-02893, 2022 WL 16578415, at *4 (S.D. Tex. Nov. 1, 2022); *Guijarro v. Enter. Holdings, Inc.*, 39 F. 4th 309, 317 (5th Cir. 2022).

In sum, while Safety Vision would perhaps need expert testimony causally linking LEI's alleged breach to the product failures its customers experienced in order to recover consequential damages, it is not logically coherent to apply the same requirement to direct damages, which, by definition, "flow naturally and necessarily from a defendant's wrongful act." *See Cherokee Cnty. Cogeneration Partners, L.P. v. Dynegy Mktg. & Trade*, 305 S.W.3d 309, 314 (Tex. App. 2009). Thus, LEI has not shown that Safety Vision lacks any necessary component of its breach of contract claim.

### iii.  Damages Related to the Products Safety Vision's Customers Did Not Return

---

[5] Safety Vision has presented sufficient evidence in the form of the two ISO reports to create a genuine dispute on the issue of breach.

Safety Vision has previously provided evidence representing that its customers complained about issues related to approximately half of the 1200 units. ECF No. 12-1 ¶ 7. LEI argues it is entitled to summary judgment with respect to "the 595 video recorders that Safety Vision admits its customers never complained about or returned." ECF No. 55 at 21. That is, LEI contends that there can be no proof of damages if Safety Vision's customers did not complain.

This argument is unsuccessful for the same reason as the causation argument. While the absence of customer complaints or returns might preclude consequential damages for lost profits, it does not necessarily preclude direct damages. Stated differently, Safety Vision bargained for RR8000s that met certain performance metrics. Safety Vision has shown that there is a genuine dispute of fact as to whether the design of the RR8000s precluded it from meeting Class C standards. If so, it may be entitled to damages to compensate it for the difference between the value of the product it bargained for and the product it received. The existence of customer complaints or returns is not necessary to show that Safety Vision received a unit of less value that that which it contracted for. Because LEI has not shown that Safety Vision's breach of contract claim fails as a matter of law, summary judgment is **DENIED**.

### h.  Breach of Express Warranties

#### i.  Evidence of Causation

Breach of express warranty requires, among other things, "that the failure to comply [with the warranty] was the proximate cause of the financial injury to the buyer." *Lindemann*, 816 F.2d at 202. LEI makes the same causation argument raised on the breach of contract claim, and the Court, in turn, reaches the same conclusion. While expert testimony linking the alleged breach to the malfunctions Safety Vision's customers experienced would perhaps have been necessary to

prove consequential damages, LEI has not shown that expert testimony is needed for Safety Vision to recover direct damages.

### ii.  Conditions Precedent

LEI argues that Safety Vision did not comply with conditions precedent to receive any benefit under the warranty. To bring a claim for breach of express warranty, a plaintiff must show that they have met the conditions precedent mandated in the express warranty provision. *See Elanco Prod. Co. v. Akin-Tunnell*, 516 S.W.2d 726, 732 (Tex. Civ. App. 1974); *London v. Curlee*, 336 S.W.2d 836, 837 (Tex. Civ. App. 1960); *Fetzer v. Haralson*, 147 S.W. 290, 294 (Tex. Civ. App. 1912); *see also Galitski v. Samsung Telecommunications Am., LLC*, No. 3:12-CV-4782-D, 2014 WL 3610789, at *3 (N.D. Tex. July 22, 2014) (applying California law).

The ODM Agreement states, "Warranty service may be obtained by contacting a LEI office within the applicable warranty period for a Return Material Authorization (RMA) number. Once an RMA number is issued, the defective product must be shipped back to LEI prepaid, insured and wrapped in the original and similar shipping package to ensure that it will not be damaged during shipment." ECF No. 55-1. The requirements that Safety Vision contact LEI for an RMA number and ship the product back to LEI are conditions precedent that must be satisfied before LEI is obligated to perform under the repair or replace warranty. Safety Vision makes no argument that the return of the products is not a condition precedent to exercising the express warranty. Instead, it argues that it was not required to comply with this condition because the repair or replace warranty failed of its essential purpose. Insofar as Safety Vision cites no authority for that proposition nor makes any argument for extending the law in such a manner, the Court must reject this assertion.

As to the units that Safety Vision did return under the warranty, LEI argues that Safety Vision's claim must fail because there is no evidence that they were not adequately repaired. However, as noted above, Safety Vision has provided evidence creating a genuine dispute over whether all of the repairs were completed and effective. Ondruch Decl. ¶ 7; Smith Decl. ¶ 11; ECF No. 69-2 at 16. Accordingly, summary judgment on the express warranty claim is **GRANTED** for LEI as to the units where Safety Vision has provided no evidence of an attempt to return them for repairs and **DENIED** as to the remaining units.

### i.  LEI's Breach of Contract Counterclaim

LEI brings a counterclaim for breach of contract, arguing that Safety Vision has failed to pay a balance of $244,927.70 for the RR8000s delivered in December 2020 and January 2021. "The buyer must pay at the contract rate for any goods accepted." Tex. Bus. & Com. Code § 2.607(a). However, a buyer make revoke its acceptance under the conditions delineated above, and "[a] buyer who so revokes has the same rights and duties with regard to the goods involved as if he had rejected them." *Id.* § 2.607(c). Because there is a genuine dispute as to whether Safety Vision revoked acceptance, as discussed in the context of Safety Vision's breach of contract claim, summary judgment is **DENIED** with respect to LEI's counterclaim.[6]

### III.  MOTION TO STRIKE

On summary judgment, Safety Vision proffers the declarations of two experts, Paul Edwards and Michael Hubbell. LEI moves to strike the portions of the declarations that address the cause of the product failures.[7] LEI argues that (1) the declarations present causation opinions

---

[6] Safety Vision's Response also objected to the declaration of Terence Chou, which LEI submitted in support it its argument for summary judgment on its counterclaim. The Court does not reach this issue, as it finds a genuine dispute of material fact notwithstanding the Chou Declaration.
[7] Although LEI does not identify what specific assertions it finds objectionable, the Court has attempted to ascertain which portions LEI might perceive as discussing causation.

that were not disclosed and were not present in their expert reports and (2) the causation opinions are conclusory.

### a. Hubbell Declaration

Rule 26(a)(2)(B) requires that an expert report contain, among other things, "a complete statement of all opinions the witness will express and the basis and reasons for them," "the facts or data considered by the witness in forming them," and "any exhibits that will be used to summarize or support them." FED. R. CIV. P. 26(a)(2)(B). On summary judgment, courts generally exclude evidence containing expert opinions that are not expressed in their Rule 26 report. *See Brumley v. Pfizer, Inc.*, 200 F.R.D. 596, 603 (S.D. Tex. 2001) ("A subsequent expert affidavit submitted to rebut a summary judgment motion may be excluded if it differs from an earlier Rule 26 report."); *Cleave v. Renal Care Grp., Inc.*, No. CIV.A. 2:04CV161-P-A, 2005 WL 1629750, at *1 (N.D. Miss. July 11, 2005) ("A new expert affidavit which is submitted to rebut a summary judgment motion should be stricken if the new opinions differ from the earlier Rule 26 report.").

Michael Hubbell's May 17, 2024 declaration stated, in relevant part,

> The RR8000 by not functioning at a minimum Class C functional status could and would be expected at times to fail to automatically return to a normal operating condition, without human intervention, following being exposed to anticipated electrical disturbances during a transit vehicle's operation. This would result in video loss, the failure to maintain video surveillance, and corruption of recorded video files or operating system files. These were the types of failures Safety Vision and its customers were experiencing with the RR8000. As a result, based upon my education, knowledge, skill, experience and training in the public mass transit field, the failure of Lanner to properly design and manufacture the RR8000 to function at a minimum Class C functional status is the probable cause for the large failure rate of the RR8000s and the recurring yet intermittent video loss as reported by Safety Vision to Lanner.

Hubbell Decl. ¶ 38. The conclusion that the RR8000's inability to achieve Class C functional status caused the large failure rate presents a causation opinion that was not present in Hubbell's expert

report. Nowhere in Hubbell's report does he opine on the likely cause of the failure of the devices experienced by Safety Vision's customers. Safety Vision argues that one of the exhibits to Hubbell's expert report, a prior declaration of Hubbell's from November 2023, contained a causation conclusion similar to that which he now presents. However, this prior declaration does not identify the methods Hubbell used to reach this conclusion. *See Snapt Inc. v. Ellipse Commc'ns Inc.*, 430 F. App'x 346, 352 (5th Cir. 2011) (affirming exclusion of expert declaration because declarant offered conclusory statements with no explanation of the methods used to reach that conclusion). Nor is it clear that an opinion expressed in an attached exhibit but not the report itself meets Rule 26's disclosure requirements. Rule 26 indicates that exhibits to an expert's report are "to be used as a summary of or support for the opinions" in the report. *See* FED. R. CIV. P. 26(a)(2)(B). Lacking is any suggestion that an exhibit may provide opinions that the report itself does not.

Thus, the Motion to Strike is **GRANTED IN PART**. The Court strikes the following sentence from Hubbell's declaration: "As a result, based upon my education, knowledge, skill, experience and training in the public mass transit field, the failure of Lanner to properly design and manufacture the RR8000 to function at a minimum Class C functional status is the probable cause for the large failure rate of the RR8000s and the recurring yet intermittent video loss as reported by Safety Vision to Lanner." However, the remainder of Hubbell's conclusions in his declaration regarding the RR8000s failure to meet Class C standards and the possible effects when a product does not meet those standards were properly disclosed in his expert report.

### b.  Edwards Declaration

The same objection is raised with respect to Edwards's declaration. In his declaration, Edwards stated,

Due to the RR8000's failure to achieve an overall minimum Class C functional status, the RR8000 would be unreliable in the contemplated normal use and service in a mass transit vehicle. For example, one would expect in a mass transit vehicle where the RR8000 was installed and failed to meet a minimum Class C functional status, the surveillance system would experience unpredictable and intermittent shutdowns that could result in the failure to reliably maintain video coverage as the vehicle involved is exposed to expected electrical disturbances and the RR8000 fails to return automatically to normal operation without human operator/user action.

Edwards Decl. ¶ 25. Unlike Hubbell's declaration, Edwards makes no improper assertions that the failure to achieve Class C statues caused the disruptions observed by Safety Vision's customers. The Court finds that the opinions expressed in Edwards's declaration are consistent with his expert report, which likewise opines on the RR8000s' inability to meet Class C standards. The Motion to Strike is **DENIED** with respect to Edwards's declaration.

## IV.    CONCLUSION

LEI's Motion to Strike is **GRANTED IN PART** and **DENIED IN PART**. LEI's Motion for Summary Judgment is likewise **GRANTED IN PART** and **DENIED IN PART.** Safety Vision's claims for DTPA violations and fraudulent concealment are **DISMISSED**.

**IT IS SO ORDERED.**

Signed at Houston, Texas on June 20, 2024.

Keith P. Ellison
United States District Judge

30